368 A.2d 661
**COMMONWEALTH of Pennsylvania**
v.
**W. A. "Tony" BOYLE, Appellant.**

Supreme Court of Pennsylvania.

Argued April 1, 1976.

Decided Jan. 28, 1977.

Reargument Denied Feb. 24, 1977.

344

A. Charles Peruto, Burton A. Rose, Philadelphia, for appellant.

Richard A. Sprague, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

W. A. "Tony" Boyle was convicted of three counts of murder of the first degree by a jury in connection with the slayings of Joseph "Jock" Yablonski, his wife, Margaret, and his daughter, Charlotte. Post-verdict motions were denied and judgments of sentence imposed. This appeal followed.

Boyle asserts numerous assignments of error and, in doing so, seeks various forms of relief, including: 1) an

arrest of judgment and discharge because the evidence is insufficient to support the verdicts; 2) a reversal of the judgments and quashing of the indictments because of the failure of the Commonwealth to afford him a preliminary hearing; and, 3) a new trial because of numerous errors during the course of the trial proceedings.[1]

██ Boyle's contention that the evidence is insufficient to support the verdicts is devoid of merit. The test for determining the sufficiency of the evidence is whether accepting as true all the evidence, together with all reasonable inferences which may be drawn therefrom upon which the jury could properly have based its verdict, such evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt. *Commonwealth v. Brown*, 467 Pa. 388, 357 A.2d 147 (1976); *Commonwealth v. Carbonetto*, 455 Pa. 93, 314 A.2d 304 (1974); *Commonwealth v. Eiland*, 450 Pa. 566, 301 A.2d 651 (1973). The evidence here clearly meets this test.

Boyle concedes the Commonwealth established that a conspiracy was formed to kill Joseph Yablonski and that Yablonski, his wife, and daughter were slain in further-

1. In addition to the assignments of error set forth in the text, Boyle asserts the following: 1) that the trial court erred in refusing to grant a continuance; 2) that the trial court erred in limiting the scope of voir dire; 3) that the trial court erred in admitting certain testimony offered by the Commonwealth to establish a motive because it was hearsay; 4) that the closing argument of the Commonwealth was not based on facts in evidence; 5) that the Commonwealth's attorney improperly commented during the trial and before the jury that counsel for Boyle had also been counsel for Albert Pass; 6) that the trial court erred in refusing to allow certain evidence to be introduced by the defense to discredit the Commonwealth's theory of motive; 7) that the trial court erred in refusing to admit certain evidence to discredit the Commonwealth's theory as to when the conspiracy was formulated; 8) that the trial court erred in refusing to admit certain evidence to discredit the Commonwealth's theory that Boyle knew certain funds were used to finance the slayings; 9) that the trial court erred in allowing cross-examination of Boyle to violate the mandate of the Act of March 15, 1911, P.L. 20, § 1, 19 P.S. § 711; 10) that the trial court erred in refusing to grant a recess prior to cross-examination of William Turnblazer; 11) that the trial court erred in admitting certain photographs into evidence.

ance of that conspiracy.[2]    But Boyle argues the evidence did not establish that he was a member of the conspiracy.

The evidence which showed that Boyle was a member of the conspiracy was both direct and circumstantial. The direct evidence consisted of the testimony of William Jenkins Turnblazer.

Turnblazer testified that he met with Boyle and Albert Edward Pass on June 23, 1969.  He further testified that at the meeting Boyle gave orders to assassinate Joseph Yablonski.   Specifically, Turnblazer testified that:

"He [Boyle] said, we are in a fight, we have got to kill Yablonski or take care of him,"

and that:

"Mr. Pass said that if nobody else would kill him, District 19 [of the United Mine Workers' Union] would,"

and that:

"[Boyle] said fine."

██ ██    In evaluating the sufficiency of the evidence, Boyle would have us disregard this testimony because Turnblazer was shown to have given contradictory versions of the facts and circumstances related to the Yablonski slayings to police and in prior judicial proceedings.  This we may not do.  In passing upon a motion in arrest of judgment, all evidence in the record must be considered.  *Commonwealth v. Tabb,* 417 Pa. 13, 207 A. 2d 884 (1965).  We might also point out the jury was made aware of Turnblazer's prior inconsistent statements and was told they were made in an effort to cover up both his and Boyle's involvement in the conspiracy. Under the circumstances, the determination of whether to believe Turnblazer was for the jury and the fact that

2.   As set forth in Boyle's brief to this Court:
   "The only matter that was in issue was whether or not . . . Boyle was in fact one of the conspirators who had participated in the plan to cause the assassinations."

he may have previously testified or otherwise given contradictory versions to that to which he testified at trial is merely a circumstance which the jury would consider in making its determination of whether or not to credit his testimony. *Commonwealth v. Snyder*, 427 Pa. 83, 233 A.2d 530 (1967).

Boyle argues that the trial court erred in refusing to quash the bills of indictment because of a failure by the Commonwealth to provide him with a preliminary hearing. The facts relevant to this argument are as follows:

On September 5, 1973, a warrant for Boyle's arrest for the killing of the Yablonskis was issued by the Court of Common Pleas of Washington County. On September 6, 1973, Boyle was indicted by a federal grand jury in the Western District of Pennsylvania for violating the civil rights of the Yablonskis. On the same day, Boyle was arrested in Washington, D.C. by federal authorities in connection with the federal charges. Following a hearing before a United States magistrate in Washington, D. C., Boyle was released on $50,000 bond, and a hearing to determine whether he should be ordered removed to Pennsylvania to face the federal charges was scheduled for September 25, 1973. On September 24, 1973, Boyle was hospitalized after apparently having taken an overdose of barbiturates. Boyle remained hospitalized until December 19, 1973. The removal hearing was postponed until September 28, 1973, at which time the United States magistrate revoked Boyle's bond and ordered Boyle to undergo psychiatric examinations. Another hearing was held in Washington, D.C. before the United States magistrate on October 1, 1973, and on October 2, 1973, Boyle's bond was "temporarily suspended" because of Boyle's condition and because of the possibility of another suicide attempt. Further, federal officials were directed to guard Boyle; that is, Boyle was placed in protective custody.

On November 28, 1973,[3] a federal district court judge for the Western District of Pennsylvania issued an order placing Boyle under federal protective custody until a further order issued from that court and setting trial on the federal charges for February 25, 1974. Boyle apparently agreed to voluntarily present himself in Pennsylvania for trial on the federal charges if the postponement until February 25, 1974 was granted. By doing so, Boyle apparently waived his right to a federal removal hearing. See 18 U.S.C.A. Rule 40, Fed.R.Crim.P. 40.[4]

On November 29, 1973, Boyle's counsel in the federal proceedings was informed by telephone of the contents of a letter mailed that same day by the Commonwealth. The letter consisted of a "notice" to Boyle that the Commonwealth intended on December 3, 1973, at 10:00 a. m. to seek leave from the Court of Common Pleas in Washington County to present three bills of indictment to the grand jury and that if such leave were granted the bills would be presented on December 17, 1973.

On December 3, 1973, the Commonwealth presented its petition to the court, which represented that Boyle had been involved in the Yablonski killings; that a warrant for his arrest had issued on September 5, 1973; that the warrant could not be properly executed because Boyle had not been in the Commonwealth since

3. The Commonwealth now represents that Boyle no longer required hospitalization as of November 26, 1973. But he apparently remained hospitalized until December 19, 1973.

Additionally, the Commonwealth represents that authorities of the District of Columbia refused to execute the Commonwealth's arrest warrant prior to a final disposition of the federal removal proceedings. This representation is not challenged.

4. The Commonwealth argues that this procedural maneuver by Boyle was intended to insure that he would be brought to trial first on the federal charges and thereby preclude prosecution by the Commonwealth. See *Commonwealth v. Mills*, 447 Pa. 163, 286 A.2d 638 (1971) which precludes dual prosecution by different sovereigns. But no proof was presented to the court in connection with the petition for leave to present the bills of indictment to the grand jury without a preliminary hearing.

September 5, 1973; that Boyle through defense counsel had refused to enter the Commonwealth; and, that Boyle was a fugitive from justice. Boyle was not represented at this hearing. The court thereupon issued an order authorizing presentment without a preliminary hearing on December 17, 1973. The bills were duly presented and indictments returned on the same day.[5]

On December 19, 1973, Boyle began serving a federal sentence on unrelated charges in the District of Columbia prison. On December 20, 1973, a writ of habeas corpus ad prosequendum was issued by the Court of Common Pleas of Washington County. Following a hearing in Washington, D.C., Boyle, pursuant to a federal court order, was brought to Pennsylvania for arraignment on the murder indictments although he remained in federal custody.

On December 21, 1973, Boyle was arraigned in Washington County. Thereafter, in pre-trial motions, Boyle moved to quash the indictments on the ground that the order granting the leave to make a presentment and the indictments being returned without a preliminary hearing improperly and unnecessarily denied him his right to a preliminary hearing. The motion was denied by order of the Court of Common Pleas of Delaware County.[6] A direct appeal from that order was filed in this Court. The Commonwealth filed a motion to quash the appeal because it was from an interlocutory order. We granted the Commonwealth's motion on March 23, 1974.

In post-verdict motions, Boyle reasserted his position. The Court en banc of Delaware County rejected Boyle's contention that he was improperly and unnecessarily de-

5. Of course, a preliminary hearing is not constitutionally mandated. See *Commonwealth v. O'Brien*, 181 Pa.Super. 382, 124 A.2d 666 (1956).

6. Venue was changed from Washington to Delaware County during the intervening period pursuant to a joint motion by the Commonwealth and Boyle.

nied a preliminary hearing stating that leave to present the bills of indictment without a preliminary hearing was properly granted pursuant to Pa.R.Crim.P. 224 and alternatively that Boyle's failure to object to the Commonwealth's petition for leave to make the presentment without a preliminary hearing and his failure to object to the order allowing such between December 3 and December 17, 1973 foreclosed the raising of the issue thereafter.

Initially, we must determine whether the issue may now be raised. Assuming, without deciding, that under other circumstances an objection must be entered to a Commonwealth's petition filed pursuant to Pa.R. Crim.P. 224 prior to leave being granted and/or prior to presentment being made, under the circumstances of this case, we rule Boyle's pre-trial motion was timely, and thus the issue is properly preserved for review. The record does not establish that any attorney had filed a praecipe for appearance in any court of this Commonwealth prior to the presentment being made; nor does it establish that any attorney was authorized to accept notice for Boyle of any proceedings in a court of this Commonwealth. Further, Boyle was in federal custody at the time of "notice" and we cannot say as a matter of law that he was free to appear even if we assume the "notice" was sufficient. Accordingly, since the issue was raised at the earliest possible time, it must be considered timely. Thus, we shall proceed to the merits of the argument.

Pa.R.Crim.P. 224 provides:

"When the attorney for the Commonwealth certifies to the court of common pleas that a preliminary hearing cannot be held for a defendant *because the defendant cannot be found in the Commonwealth* or that the statute of limitations will run prior to the time when a preliminary hearing can be held or that a preliminary hearing cannot be held for *other good cause*, the court

may grant leave to the attorney for the Commonwealth to present a bill of indictment to the grand jury without a preliminary hearing." [Emphasis added.]

Undoubtedly, the determination of whether to grant leave to present pursuant to Rule 224 is within the sound discretion of the court and its determination will not be disturbed on appeal absent an abuse of that discretion. *Commonwealth v. Bunter*, 445 Pa. 413, 282 A. 2d 705 (1971); *Commonwealth v. Hoffman*, 396 Pa. 491, 152 A.2d 726 (1959). In determining whether the court abused its discretion, we must confine our review to the facts and circumstances presented to the court, and the facts must present a situation which satisfies one of the three disjunctive conditions requisite to the court being empowered under the Rule to grant leave.

Instantly, the Commonwealth represented Boyle was not within the Commonwealth. Obviously, such a representation, if true, satisfies the condition that "the defendant cannot be found in the Commonwealth." Pa. R.Crim.P. 224. Furthermore, the veracity of the representation has never been challenged; to the contrary, it is conceded. Accordingly, we cannot say the court abused its discretion in granting leave.[7]

Boyle cites *Commonwealth v. Brabham*, 225 Pa.Super. 331, 309 A.2d 824 (1973), in support of his position. In that case, our Superior Court ruled that, since the accused was imprisoned in a county in Pennsylvania and his presence in a second county where additional criminal charges were pending could have been effectuated through a statutorily provided procedure, "good cause" did not exist under Pa.R.Crim.P. 224 for the court to grant leave to indict without affording the ac-

7. We note that as previously indicated the Commonwealth's representation, that authorities of the District of Columbia refused to execute the Commonwealth's arrest warrant prior to a final disposition of the federal removal proceedings, has not been challenged.

cused a preliminary hearing. The instant case is distinguishable because Boyle was in custody in a jurisdiction other than Pennsylvania. The term "other" immediately preceding "good cause" in Rule 224 clearly indicates that if an accused cannot be found in Pennsylvania, this constitutes "good cause" under Rule 224.

Boyle argues that the condition, "cannot be found in the Commonwealth," refers only to "fugitives" and that that term, in effect, refers to persons whom the authorities of this Commonwealth either cannot locate or can locate but for which no statutory procedure exists to bring such persons into the Commonwealth. Suffice it to say, Pa.R.Crim.P. 224, in this context, is clear and free from ambiguity and does not address itself to a limited class, i. e. fugitives; rather, it speaks to a "defendant [who] cannot be found in the Commonwealth," and we will not disregard the letter of a rule in pursuit of its spirit in such a situation. Pa.R.Crim.P. 2; 1 Pa.C.S.A. § 1921(b).

Boyle maintains numerous trial errors mandate the granting of a new trial. Since we agree that a new trial is required because the trial court improperly refused to admit the offered testimony of Thomas Kane, an auditor for the federal government, and since the other asserted assignments of error do not present situations which will necessarily arise in a new trial, we need discuss only the court's refusal to allow Kane's testimony to be introduced at trial. The factual background in which the offer and ruling were made is essential to a proper understanding of how the ruling prejudiced the proceedings.

The Commonwealth's theory at trial was that Boyle was motivated to form the conspiracy to kill Yablonski because Yablonski had challenged him for the presidency of the United Mine Workers' Union and that, while the actual slayings took place after Boyle won the presidency, Boyle remained motivated because Yablonski did not concede the election, but rather challenged the validity of

the election results and initiated plans to overturn the election. On the other hand, Boyle maintained the officials of District 19 formed the conspiracy and hired the killers without his knowledge. He urged that the officials of District 19 were motivated by a fear of having irregular financial transactions within District 19 revealed by Yablonski as he had threatened to do. In support of this defense, Boyle emphasized that even under the Commonwealth's evidence all of the conspirators, other than Boyle, were either officials of District 19 or persons brought into the conspiracy by officials of District 19. Also, under the Commonwealth's evidence, it was clear that Albert Edward Pass, Secretary-Treasurer of District 19 and William Turnblazer, President of District 19, were the leaders in carrying out the conspiracy.[8]

Because the election for the presidency of the United Mine Workers' Union had resulted in Boyle winning and because the slaying took place subsequent to the election, the Commonwealth introduced evidence to show Boyle knew Yablonski intended to challenge the election results. The obvious purpose of this evidence was to establish a continuing or renewed motive on the part of Boyle to have the object of the conspiracy effectuated.

As part of his defense, Boyle sought to introduce the testimony of Thomas Kane, an auditor for the federal government, to show that an audit of District 19 for the year 1969 and other years had been made subsequent to the slayings and that the audit would reveal a motive on the part of the officials of District 19, independent of

8. According to the Commonwealth's evidence, Pass solicited William Jackson Prater to find individuals who would kill Yablonski for a price. Prater in turn solicited a close friend, Silas Huddleston, a retired miner and president of a pensioners' local within District 19. Huddleston solicited Paul Gilly, his son-in-law, who solicited Annette Gilly, his wife, Claude Vealey and Aubran Wayne Martin. Gilly, Vealey and Martin committed the killings.

Boyle's motive, to kill Yablonski. Specifically, counsel stated:

"[Kane] did make an investigation with respect to District 19 and is in a position to testify as to the financial status of District 19 for the year 1969 and other years, [1] to show and reflect that loans were not unusual,[9] as testified to on direct examination, [2] to show the status of these accounts so that the Court can see and determine whether there was any reason to fear an investigation of this Union.

"The reason that I point that out to the Court is simply that Mr. Yablonski during the campaign had made allegations against District 19 and as to what they were doing. And I feel with that, in view of the testimony presented by these witnesses, we will be in a

**9.** The offer clearly sets forth two purposes for the testimony concerning the audit. As to the first purpose the court's ruling was undoubtedly correct. The Commonwealth had established that two loans were made by the International Union to District 19 and that funds from these loans were used to finance the slayings. The Commonwealth had further established that the requests for the loans had been sent directly to Boyle by Pass and that normally such requests were sent to the secretary-treasurer of the International. Thus, the fact that loans were made by the International to District 19 or other districts was irrelevant because it would not discount the inference that the two loans involved herein were unusual because the requests for them had been sent directly to Boyle.

But the court never confronted the second purpose for which the testimony concerning the audit was offered, and the second purpose, as the length of the textual discussion clearly indicates, was pointed out to the court at length. Further, while the offer of proof with regard to Kane also offered to have him testify as to other matters which, for reasons we need not here discuss, were ruled inadmissible, the court clearly understood that the audit was not being offered as a whole with the other matters, and this fact is further supported by the court *en banc's* opinion which ruled on the admissibility of the audit and other matters separately and which opinion was authored by the trial judge. Thus, the rule of *Purcell v. Met. Life Ins. Co.*, 336 Pa. 588, 593, 10 A.2d 442, 443 (1940), that "[s]ince part of the testimony included in the offer was patently inadmissible, and the evidence was offered as a whole, it was not error for the learned trial judge to reject the whole. . . .," is inapplicable instantly. See McCormick, Evidence § 52 (2d ed. 1972).

358

position to contradict and impeach Turnblazer and all the members of District 19 including Pass; that the real fear in this case was not an election or rerun by Tony Boyle, which has been suggested by Mr. Miller, but is the fear that the District No. 19 had of an investigation that had been threatened by Mr. Yablonski in his lifetime, and was testified to by others on various occasions. And accordingly, I feel that the financial status of the District 19, to have the jury see and determine whether these district officials had anything personally to fear of a threatened investigation by Mr. Yablonski, would be appropriate and relevant in this case.

\* \* \* \* \* \* \* \*

"May I also point out, Judge, if I have not pointed out, that the question of knowledge, motive, reason and all of those things which motivated the people in the District No. 19, that a Defendant is entitled to present and produce testimony that bears upon that motive, that knowledge, those reasons, those purposes for which they acted. And if we are restricted, then we are not permitted to demonstrate that the people in District 19 had reason to fear Mr. Yablonski not only because of what he had stated in his campaign, but also what was done with respect to the audit, and what is disclosed, to let the members of the jury know whether these people had something to hide in connection with this particular case, because the testimony is that they did have something to hide.

\* \* \* \* \* \* \* \*

"Yes. What Mr. Yablonski was going to do during his campaign with respect to District 19 in public certainly would have some bearing upon the reaction of the people in District 19, unconnected with Mr. Tony Boyle . . . "

Basically, Boyle sought to show through the audit [10] that financial matters in District 19 were irregular [11] and that Yablonski had threatened to investigate District 19, in order to provide a basis from which the jury would conclude that the officials of District 19, namely Pass and Turnblazer, had a motive for the slayings which Boyle did not share.

It is well-established that proof of facts showing the commission of the crime by someone else is admissible. *Commonwealth v. Loomis,* 270 Pa. 254, 113 A. 428 (1921) ; *Commonwealth v. Winegrad,* supra. The Commonwealth had shown that Pass and Turnblazer committed the crimes involved herein and the only issue was whether Boyle was also involved in the commission of those crimes. In order to establish a basis from which to infer he was not, he clearly should have been al-

10. Counsel did not represent that the audit would, in fact, show irregularities with regard to the District 19 finances; rather, he stated he believed the audit would show such irregularities. He did so because the federal government refused to allow the audit to be examined until Kane actually took the stand at trial. But counsel had subpoenaed the audit for trial. Furthermore, the Commonwealth did not object to the offer on the basis that the audit would not show what counsel represented, as his belief, it would show, and the court ruled on the officer as if the audit would, in fact, show irregularities in District 19's finances. Under such circumstances, we must accept counsel's representations as to what the audit would say as true. Cf. *Commonwealth v. Gatewood,* 221 Pa.Super. 399, 293 A.2d 80 (1972); Jenkins, Pennsylvania Trial Evidence Handbook, § 18.5 (1974).

11. Of course, to be admissible the audit showing the irregularities of District 19's finances would have to provide a basis from which the jury could have inferred the officials of District 19 had a motive for the slaying independent of any Boyle may have shared in order to provide a basis from which to further infer Boyle was innocent. *Commonwealth v. Winegrad,* 119 Pa.Super. 78, 180 A. 160 (1935). But the Commonwealth does not assert that Boyle was in any way connected with the irregularities in District 19's finances other than his involvement with the two loans used to finance the slaying involved herein, and his involvement with those loans was a triable issue of fact in this case. Thus, if the jury believed the evidence showing irregularities, it may have then inferred that Boyle did not share this motive and that would have clearly militated against accepting the motive on the part of Boyle established by the Commonwealth.

lowed to show Pass and Turnblazer had a motive for killing Yablonski which he did not share because, although motive is not an essential element of the crime, it is always relevant and admissible. *Commonwealth v. Adkins*, 468 Pa. 465, 364 A.2d 287 (1976). Thus, in order to show Pass and Turnblazer were the originators of the conspiracy so that the jury might infer he was not a party to the conspiracy, Boyle should have been allowed to show their motive for effectuating the slayings. The offer as stated would have shown the accounts of District 19 were irregular and when coupled with the remainder of the offer, that Yablonski had threatened to investigate District 19, the evidence if admitted would have shown Pass and Turnblazer had a motive of their own to formulate and carry out the conspiracy.

Moreover, the testimony was undoubtedly very important to the jury's consideration because in this case one of the officials, who may have had an independent motive, namely Turnblazer, provided crucial testimony connecting Boyle to the conspiracy. Furthermore, Turnblazer's credibility was one of the most important issues of fact for the jury to resolve; as noted before he was shown on cross-examination to have provided contradictory versions of the events on numerous prior occasions, and despite his admission of guilt to serious crimes, he had not yet been sentenced.

In sum, if Boyle could have shown what he proposed, the jury would have been faced with determining whether Turnblazer and Pass acted without Boyle's knowledge because they wished to keep the irregularities of District 19's finances unknown to others or whether they acted on Boyle's directions because of Boyle's fear of having the election overturned. Because of the court's ruling, the jury was unaware of any independent motive on the part of Pass and Turnblazer. The ruling thus denied Boyle his right to present relevant, material and compe-

tent evidence from which the jury might have inferred he was not involved in the Yablonski slayings.

Accordingly, the judgments of sentence are reversed and a new trial is ordered.

ROBERTS, J., filed a concurring opinion.

NIX, J., filed a dissenting opinion, in which Mr. Chief Justice JONES joins.

ROBERTS, Justice (concurring).

I join in the majority opinion insofar as it holds that appellant is entitled to a new trial because evidence he offered was improperly excluded by the trial court.

NIX, Justice (dissenting).

While I agree that it was error to prevent the defense from introducing the testimony of Thomas Kane, I do not believe that it reaches the magnitude to justify the reversal of the judgment of sentence. I therefore dissent.

Concededly, the introduction of evidence which, if believed, would provide an independent basis for hostility by the officers of District 19 directed towards the victim, Mr. Joseph Yablonski, might support the appellant's contention that this crime was conceived and carried out without his participation or knowledge. However, this testimony also is susceptible to the equally strong (or possibly even stronger) inference that the fear of disclosure of the mismanagement of the funds of the Local made the members thereof more susceptible to Boyle's urgings. It is quite probable that one who seeks an accomplice in a heinous deed such as this would look to another who shared the feeling of enmity towards the intended victim.

In my judgment the introduction of this testimony had at best a tenuous connection with the ultimate finding of

guilt or innocence and was of such a nature that its impact was more likely to have been adverse to the appellant's position rather than helpful. The mere fact that two individuals' dislike for a third person stems from different motives in no way refutes the possibility that those individuals will act in concert in giving vent to this feeling. In such a posture the exclusion of this testimony, although improper, could hardly be considered reversible error.

Mr. Chief Justice JONES joins in this dissenting opinion.