**UNITED STATES of America**

v.

**Terry Eugene SAVAGE.**

**Crim. No. 76–132–1.**

United States District Court,
M. D. Pennsylvania.

April 6, 1977.

As Amended June 13, 1977.

Brandon Alvey, Timothy J. Wilson, Dept. of Justice, Crim. Div., Washington, D. C., for United States.

John M. Humphrey, Clifford A. Rieders, Williamsport, Pa., for Terry Eugene Savage.

H. Richard Agler, Milton, Pa., Wayne A. Bromfield, Lewisburg, Pa., for Ronald Shepard.

Frank E. Garrigan, George J. Nagle, Shamokin, Pa., for Dwayne O. Wiggins.

Joel S. Perr, Pittsburgh, Pa., for Vernon Woodson.

## OPINION

MUIR, District Judge.

On December 21, 1976, Defendants Savage, Shepard and Woodson were found guilty of murder in the first degree for the stabbing death of inmate Mark Silver at the United States Penitentiary in Lewisburg, Pennsylvania on May 15, 1976. Defendant Wiggins was convicted of murder in the second degree. Defendant Savage has filed a motion for new trial. Defendants Shepard and Wiggins have filed motions for new trial and judgments of acquittal. Defendant Woodson joins in the motions and brief filed by Defendant Shepard.

Defense counsel take a dragnet approach to the issues raised, each incorporating and adopting the motions and briefs of the others. Consequently, unless otherwise indicated, the Court will treat every issue as if it has been raised by all Defendants. Nevertheless, defense counsel's respective positions on the various issues are ambiguous. For example, in his supporting brief at page 2, Defendant Savage "incorporates the arguments submitted by other Defendants on these issues and on the other issues raised in the new trial Motion." Two pages later, Savage states, " . . . in this Brief, counsel will not be arguing that the verdicts were against the weight of the evidence as a matter of law. It is realized that questions of credibility are normally for the jury." However, the briefs submitted by Defendants Shepard and Wiggins and ostensibly incorporated by Savage contend at length that the verdicts are against the weight of the evidence and are not supported by "substantial evidence".

The Court will treat the points raised by defense counsel in their approximately chronological order.

### I. Denial of Access to Central Prison Files.

The Court denied pre-trial motions for discovery by Savage and Wiggins which requested an opportunity to inspect and copy relevant portions of the central files of all Government witnesses. See Orders dated November 15, 1976 in Criminal No. 76–132–1 and December 3, 1976 in Criminal No. 76–132–2. (Although they filed no motions of their own, Shepard and Woodson apparently received the fruits of the motions by the other two Defendants.) The files were subsequently provided to defense counsel during trial. The Defendants assert that the denial of their requests for pre-trial inspection impaired their ability to digest the material contained therein and undercut their attempts at impeachment of Government witnesses.

▆▆▆ The Defendants were represented by six court-appointed attorneys and a private lawyer retained by Mr. Woodson. As evidenced by the motions under consideration now, there was little, if any, conflict of interest among the Defendants. Their counsel readily cooperated with one another. The Court has perused more than one central prison file and knows that many of the documents contained therein are completely irrelevant to an individual's credibility as a witness in a criminal case and can be passed over rapidly. The resources available to the Defendants were adequate to permit them to analyze the central prison files of Government witnesses while the trial was in progress. The cross-examination of prosecution witnesses, which was lengthy and detailed, did not suffer from a

paucity of information concerning the individual under interrogation. To have permitted inspection of the central files prior to trial would obviously provide the Defendants with a list of government witnesses. They are not entitled to such a list. *U. S. v. Mitchell,* 540 F.2d 1163, 1166 (3d Cir. 1976); *U. S. v. Addonizio,* 451 F.2d 49, 62 (3d Cir. 1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

## II. Denial of Pre-Trial Access to Grand Jury Minutes.

■■■ The Defendants challenge that portion of the Court's Orders of November 15, 1976 and December 3, 1976, which denied them access to Grand Jury Minutes prior to trial. As with the central files discussed in the preceding section, this information was provided to defense counsel during the course of the trial. The Defendants concede that only in unusual circumstances does a Court deviate from the general rule that the testimony of a Grand Jury witness is excluded from discovery until that individual testifies at trial. See *U. S. v. Eisenberg,* 469 F.2d 156 (8th Cir. 1972), *cert. denied* 410 U.S. 992, 93 S.Ct. 1515, 36 L.Ed.2d 190 (1973). Nevertheless, they maintain that the exigencies and complexities of this particular case required such discovery. The Court does not agree.

The Defendants point to no specific instance where their alleged inability to parse the Grand Jury transcripts during trial caused them to miss vital points for interrogation and impeachment. On the contrary, the defense made protracted use of the Grand Jury proceedings in its cross-examination of Government witnesses. An observer at trial or a reader of the transcript would find surprising the Defendants' contention that they were unable fully to exploit the often inconsistent Grand Jury testimony of Government witnesses.

## III. Denial of Motion for Continuance.

Late in the afternoon of December 2, 1976, the day prior to the commencement of jury selection, Defendant Shepard's lead attorney filed a motion for a one-month continuance, citing the large volume of materials which he and his fellow counsel had recently obtained from the Government and had been unable to analyze. On December 3, 1976, prior to the jury selection, the attorneys representing Defendant Savage stated that, while they did not oppose the motion, they were prepared to begin the trial. Counsel for Defendants Wiggins and Woodson joined in the motion for continuance. The motion for continuance was denied but the Court agreed not to begin the trial prior to Monday, December 13, 1976. (Vol. I, Tr. 4–21). The moving Defendants maintain that it was error to refuse the request for a continuance to the January list.

■■ The Court is of the view that the 10-day lapse between the denial of the motion and the commencement of trial provided adequate time for counsel to prepare the case. The quality of the defense was not perceptibly impaired by the alleged inability of counsel to digest the relevant factual information or to pursue interviews of potential witnesses. Responsibility for the snowballing of their workload prior to trial must be borne, at least in part, by original counsel for Shepard and Wiggins. The Court routinely grants motions for the appointment of additional counsel in murder cases. See 18 U.S.C. § 3005. Wiggins' primary counsel was appointed on September 30, 1976 and Shepard's on October 5, 1976. However, Shepard's motion for the appointment of additional counsel was not filed until November 15, 1976 and Wiggins' not until November 22, 1976. In contrast, principal counsel for Savage, who was appointed on September 30, 1976, filed his motion for additional counsel on October 14, 1976. Thus, the attorneys first appointed to represent Wiggins and Shepard were without the aid of another lawyer for well over one month. Undoubtedly, work which could have been performed during that time by a second attorney, but which was left undone, swelled the size of the task confronting counsel just prior to trial and helped prompt the motion for continuance.

## IV. Denial of Certain Proposed Voir Dire Questions.

The four Defendants are Black and representations were made that the evidence would have racial overtones. Consequently, in addition to the regular questions presented by the Court to the panel as a whole, each prospective juror was subjected individually to 20 voir dire questions, propounded by a defense counsel, the purpose of which was to identify those who were racially prejudiced. The Defendants now contest the Court's failure to ask several individual voir dire questions concerning racial attitudes, prejudice against witnesses who are convicted felons, and possible relationships with law enforcement officers and employees of the Lewisburg Penitentiary.

■ The challenge to the exclusion of the two racial questions is an affront. For two full days, including December 3, 1976, which ran from 10:00 A.M. until 5:20 P.M. with 28 minutes for lunch, prospective jurors were intensively and exhaustively interrogated as to their possible prejudice. The Court is of the view that it tolerated an inquisition far in excess of what is required by law. See *Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976) and *Ham v. South Carolina,* 409 U.S. 524, 525, n. 2, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). To maintain that a new trial should be granted because two particular questions requiring narrative answers were not asked is frivolous.

■ The Court routinely denies requests by defense counsel to ask jurors whether they would be less likely to believe a witness who is a convicted felon. Laymen do not know the intricacies of the law and, until they are instructed by the Court, it is unfair for them to be expected to respond to such a question. Furthermore, all jurors are asked whether they will adhere to the instructions given them by the Court, (Vol. I, Tr. 58), which include, where appropriate, a charge on the weight which the jury may give to a witness's prior conviction of a felony. Defense counsel's reliance on the exclusion of this question as a ground for a new trial is somewhat bizarre. But for a doctor and several prison guards, whose testimony was, with the exception of an identification of Defendant Wiggins, little more than background, *all* witnesses in this case were convicted felons.

■ The indiscretion with which counsel have pursued the motion for new trial is illustrated by the attack on the Court's exclusion from the individual *voir dire* of two questions probing jurors' relationships with prison personnel and law enforcement officers. On December 2, 1976, the Court inquired of the jury panel:

"Have you or has any member of your immediate family or any of your close personal friends ever served as law enforcement officers?" (Vol. I, Tr. 53).

A few moments later, the Court also inquired:

" . . . is there any member of your immediate family or any close friend of yours who works at the Federal Penitentiary in Lewisburg?" (Vol. I, Tr. 61).

Several affirmative answers to the first and one to the second question were received. The suggestion that these questions, which jurors routinely answer without embarrassment, should have been made a part of the individual *voir dire* is without merit.

## V. Limitation on Testimony re Prior Stabbing.

Earlier in the day of the Silver murder, a Black inmate named Scipio was stabbed, although not fatally. The Defendants sought to cross-examine several Government witnesses with respect to their involvement in the Scipio stabbing to establish their hostility to some or all of the Defendants, to demonstrate the witnesses' own involvement in the stabbing and the possible immunities from prosecution or administrative discipline which they had received as a result of their testimony, to expose the witnesses' allegedly calculated selection of the Defendants as individuals who would appear to have been taking revenge for Scipio, and to portray one or more of the witnesses as the assailants of Mark Silver, who had been a witness to the Scipio incident.

All of these matters were explored by the defense. The jury was certainly aware of the Scipio stabbing and its possible relationship to Silver's death. Witness Luera was queried with respect to the Scipio prosecution and the Government's investigation of him as a suspect, (Vol. IV, Tr. 50, 114, 117). The Scipio matter arose several times in defense counsels' closings, (Vol. VIII, Tr. 55–56, 58, 62, 65, and 76).

Citing the reasoning of a recent Pennsylvania Supreme Court case which ordered a new trial for former United Mine Workers President and convicted murderer, W. A. Boyle, the Defendants contend that the Court erred by precluding the proof of facts tending to show commission of the Silver murder by someone other than the accused. *Commonwealth v. Boyle,* —— Pa. ——, 368 A.2d 661, 669 (1977). Assuming *arguendo* that the reasoning of Boyle would be adopted by the Third Circuit or the United States Supreme Court, the circumstances of this case, as chronicled below, do not fall within the scope of that holding.

In its examination of Government witness Cutler, the defense attempted to demonstrate a motive for an alleged killing of Silver by Luera. At sidebar, Mr. Humphrey, co-counsel for Savage, argued:

"Now we think we can show that Mr. Luera was so actively involved in the [Scipio] stabbing and that would have also given Mr. Luera a motive to assault or kill Mr. Silver because Mr. Silver, according to this man's [Cutler's] previous statement, was attempting to stop the Scipio stabbing and witnessed the entire thing." (Vol. VI, Tr. 24.)

\* \* \* \* \* \*

"Luera had this very active part, and I think that the evidence, if not from this man than [sic] from others, will indicate that when Scipio was stabbed, it was felt he was going to die. In other words Mr. Silver, as far as Mr. Luera is concerned, witnessed him participating in a murder of an inmate. And certainly that would have given Mr. Luera motive to do harm to Mr. Silver. These are matters of argument. I think that at this point the

situations are closely enough involved that we have to get into it." (Vol. VI, Tr. 25).

A few moments later, the following exchange occurred:

"THE COURT: Well is Scipio alive?

MR. HUMPHREY: Yes.

THE COURT: Is he in Lewisburg?

MR. HUMPHREY: Yes.

THE COURT: Have you subpoenaed him?

MR. RIEDERS [co-counsel for Savage]: Yes.

THE COURT: Is he going to testify?

MR. RIEDERS: It is up to you.

THE COURT: What do you mean it's up to me? Is he going to come in here and get on the stand and tell the story, or is he going to decline to testify?

MR. HUMPHREY: He will testify.

MR. RIEDERS: He will, but we would prefer, in order to save time, to get it through Mr. Cutler.

THE COURT: Well you are not saving any time. This thing is so convoluted I can barely understand it. I couldn't grasp it even up to now I couldn't grasp what you are trying to show with respect to Luera when he was on the stand. And you have simply got to present these things to me in some fashion that I can make head or tail out of it. But why do you need to go into it with this man if you are going to put Scipio on the stand and say Luera was in my cell and was trying to stab me?

MR. HUMPHREY: The reason, your Honor, is we believe that this man now is attempting to protect Luera, that they have gotten together; they have made some stories about the Silver murder, and now they are attempting to protect each other or protect Luera on this previous incident. I think that goes very definitely to their credibility in this case." (Vol. VI, Tr. 27–28).

\* \* \* \* \* \*

"THE COURT: Do you [Government counsel] object to the question? Did he

observe anything with respect to the Scipio matter?

MR. ALVEY [co-counsel for the Government]: He already denied that, your Honor.

THE COURT: Well I thought he did too. Did he do that?

MR. HUMPHREY: Well if he does that, then he is saying something completely different from what he said shortly after the thing happened.

THE COURT: Well you have a statement from him, why don't you produce it. I am certainly going to let you ask him, or you can read to him what he said about observing the Scipio incident and ask him how he can say that when he said something else on the stand.

Do you have any objection to that?

MR. ALVEY: That's perfectly proper cross examination.

THE COURT: Now is that enough at this point?

MR. HUMPHREY: That's enough at this point." (Vol. VI, Tr. 30–31).

Thereafter followed several questions, to which Mr. Cutler responded that he had heard a scuffle and observed Luera leaving Scipio's cell with a knife. Counsel also elicited from Cutler a statement that Silver attempted to stop the Scipio stabbing. (Vol. VI, Tr. 37.)

Randolph Scipio, who was under a writ of habeas corpus ad testificandum and who was being held in the Lewisburg vicinity during the trial, did not testify.

In his closing, Mr. Rieders alluded to the defense theory that Luera killed Silver:

"There was testimony that when Mr. Scipio was taken away, he was bleeding very badly. They may have thought he was dead. Think about Mr. Luera's motivation in this case. Think about Mr. Cutler's motivation, only one witness— maybe there were more than one witness—but one witness whom we know tried to break it up. Think about the motivation these men had to testify. Think about their lies. Think about their

other involvements when you deliberate." (Vol. VIII, Tr. 58).

\* \* \* \* \* \*

" . . . Do you have doubt about why Mr. Luera, who may have had a very good reason to be upset with Mr. Silver because Mr. Silver tried to break up a knifing attack on Mr. Scipio—think about Mr. Luera's motivation. Think about whose hide he is covering.

"Think about Mr. Cutler and whose hide he may be covering, his friends." (Vol. VIII, Tr. 65).

The Court never precluded an attempt by the defense to demonstrate Luera's involvement in the Scipio stabbing by testimony from Scipio himself. It *never* sustained an objection to a precise proposed question to witness Cutler concerning Luera's involvement in the Scipio stabbing, except one whose form was ambiguous and was re-asked. (Vol. VI, Tr. 36). In fact, the defense was able to elicit testimony from Cutler that he heard a struggle in Scipio's cell, heard Silver attempt to stop the attack and observed Luera emerging therefrom carrying a knife. Thus, contrary to the assertions of counsel, the possibility that Luera murdered Silver to exterminate an eyewitness to Scipio's stabbing was before the jury. Although the Court may have at some point expressed its concern about the relevancy of the inquiry, it did not limit any actual attempts by the Defendant to explore that avenue. Consequently, *Commonwealth v. Boyle*, —— Pa. ——, 368 A.2d 661 (1977) is inapposite to the evidentiary history of this case.

■ The Defendants were not prejudicially restricted in any aspect of their interrogations concerning the Scipio stabbings. On its review of the record, the Court was in fact somewhat surprised to discover that although several objections in this area were aired and discussed, see, for example, Vol. IV, Tr. 113–118, and Vol. VI, Tr. 23–31, no objections to specific questions with respect to this matter were sustained during the cross-examinations of Luera and Cutler, save one whose substance was amply covered by other inquiries. (Vol. IV, Tr. 121).

Contrary to the impression given by the briefs in support of the motions for new trial, the Scipio stabbing formed a significant portion of the testimony.

### VI. Lack of Hearing on Pre-Trial Identification Procedures.

All Government eyewitnesses were shown a series of photographs prior to trial and asked to identify Silver's assailant(s). The defense argues that the in-court identifications by those witnesses were tainted by the Government's impermissibly suggestive pre-trial interrogations and that the Court erred by failing to hold a hearing to inquire into the circumstances surrounding those activities. Copies of the photographic spread used by the Government had been furnished to defense counsel during discovery. (Vol. IV, Tr. 203).

A defendant has the customary burden of timely and appropriate objections to the admission of evidence at trial. *U. S. v. Mitchell,* 540 F.2d 1163 (3d Cir. 1976). When the photographs were provided to them, defense counsel could have requested a formal inquiry on the issue of impermissibly suggestive pre-trial identification procedures, *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Simmons v. U. S.,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), but no demand for an evidentiary hearing was ever made. The only request by any defense counsel remotely resembling such a motion came on the second day of trial during a side-bar conference on this question:

"MR. RIEDERS: I'm saying that the Government has violated the rule of this case [*U. S. vs. Mitchell, supra*] by not advising us of the fact that Crow made an identification from a photo spread. I think therefore he has to be stricken as a witness all together. His testimony must be stricken and I think Your Honor ought to consider a motion for a mistrial." (Vol. IV, Tr. 204).

Thereafter ensued a discussion of the Government's obligation to alert defense counsel to its use of the photographic spread and the identifications made by potential witnesses. No demands prior to trial or up to the moment of the above-quoted remark had been made by the Defendants for such information.

The Government was under no affirmative duty in this case to announce the use of pre-trial identifications. Cf. *U. S. v. Mitchell, supra,* at p. 1166, n. 3; *U. S. v. Conway,* 415 F.2d 158, 161–162 (3d Cir. 1969). In this case, the Defendants should have recognized that the photographs which were provided to them had been used with potential eyewitnesses. It then became their duty to secure information about the pre-trial identifications of the Defendants made by Government witnesses and to demand an evidentiary hearing if they deemed it necessary. The statement by Mr. Rieders quoted above, even if construed as a combined motion to strike and for mistrial, does not suffice. In *Mitchell,* the Third Circuit refused to overturn the District Court's refusal to grant a mistrial at the conclusion of the evidence where, as here, no hearing on the issue of taint had previously been demanded.

At the conclusion of the bench conference referred to above, the Court stated that it would entertain the matter the following day after all parties had had an opportunity to read the then recent *Mitchell* case. The following day, the trial resumed without any motions or reference by counsel to the previous day's discussion of the pre-trial identification procedures. The testimony proceeded to its conclusion several days later and included other witnesses who had been shown photographic spreads. Nevertheless, no demand for an evidentiary hearing was forthcoming. Defense counsel, who vigorously represented their clients, chose not to pursue the matter further and the Court does not have the duty to inquire *sua sponte* into the question of undue suggestion by reason of pre-trial identification procedures. See *U. S. v. Mitchell,* 540 F.2d 1163, 1167 (3d Cir. 1976).

## VII. Cautionary Instructions to Jury on "Special Parole".

During the cross-examination of Government witness Cutler in the morning of the fourth trial day, the following exchange occurred:

"Q Mr. Cutler, have you ever heard of anything called special parole?

A Speaking of Presidential pardon?

Q No, special parole, the power in certain extraordinary circumstances to parole someone before the parole eligibility date.

A No I haven't.

Q Mr. Cutler, you realize that when you do go before the Parole Board, when you do get your chance to get out of prison from your life sentence, one of the things that the Parole Board will take into consideration is whether your release would depreciate the seriousness of your offense, do you not?

A Yes.

Q And your offense is kidnapping with a life sentence?

A Yes.

MR. HUMPHREY: I have no further questions." (Vol. VI, Tr. 79).

After the jury was excused for lunch, the Court expressed its concern that the above-quoted colloquy had left a misimpression with the jury. During the noon recess, the legal definition of "special parole" was researched and the only one found related to an additional sentence which must be imposed for certain drug offenses. See, for example, 21 U.S.C. § 841(b). The Defendants argued that in prison vernacular "special parole" refers to the provisions of 18 U.S.C. § 4205(g), a then six-month old statute which provides that at any time upon motion of the Bureau of Prisons, the sentencing court may reduce any minimum term to the time the defendant has served. (Vol. VI, Tr. 96–99). The Court, believing that a potential for misunderstanding by the jury existed, gave the following curative instruction over strenuous objection:

"There was some questioning by defense counsel of Mr. Cutler concerning special parole. The term special parole is totally inapplicable to the witness G. W. Cutler. The term relates to a special additional penalty which is required by statute to be imposed by a sentencing Judge in certain specific types of narcotics cases. The offense for which G. W. Cutler was convicted was not of this type." (Vol. VI, Tr. 161).

The Defendants' motion for mistrial was denied and the case continued without further reference to "special parole".

The Defendants argue that because credibility was *the* crucial factor in this case, the Court's instruction to the jury had the effect of buttressing Mr. Cutler's believability and prejudiced their case. The Court adheres to the correctness of its action. However, even assuming that it was error to make the above-quoted statement to the jury, the harm to the Defendants was, in the context of the entire trial, miniscule. Cf. *U. S. ex rel. Harding v. Marks,* 541 F.2d 402, 405 (3d Cir. 1976). Mr. Cutler, like all Government witnesses who named particular Defendants, was subjected to vigorous interrogation. The Court's isolated remark did not reflect on other lines of impeachment pursued by the defense. In retrospect, although involving a very important point of principle on proper cross-examination, (Vol. VI, Tr. 160–161), the "special parole" incident was, relative to the ultimate questions of guilt or innocence, much ado about very little and its effect on the jury, if any, was correspondingly minor. The Court unhesitatingly concludes that it is "highly probable" that the challenged statement did not contribute to the jury's guilty verdicts. *Government of Virgin Islands v. Toto,* 529 F.2d 278, 282–284 (3d Cir. 1976); *Kotteakos v. United States,* 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (2d Cir. 1946).

## VIII. Denial of Defendants' Points for Charge.

The Defendants challenge the denial of their proposed points for charge which expounded on the inherent uncertainty of eyewitness identification as well as a point

which sought to place before the jury the defense's contention that "special parole" can refer to 18 U.S.C § 4205(g).

 Counsel's precise wording need not be followed so long as the substance of a valid point is covered. *U. S. v. United States Gypsum,* 540 F.2d 115, at page 136 (3d Cir. 1977); *James v. Continental Insurance Co.,* 424 F.2d 1064 (3d Cir. 1970). Eyewitness identification testimony was the subject of a significant portion of the Court's charge to the jury and included, contrary to the Court's usual practice, an illustration drawn from an incident earlier in the day involving the sudden and short-lived illness of Defendant Shepard. (Vol. VIII, Tr. 151–153). Viewed as a whole, *United States ex rel. Harding v. Marks,* 541 F.2d 402, 405 (3d Cir. 1976), the instructions to the jury adequately covered the subject of identification testimony.

 For the reasons stated above in Section VII, the Court is of the view that its refusal to instruct the jury on the defense's interpretation of "special parole" and 18 U.S.C. § 4205(g) was not prejudicial error. Furthermore, the requested point sought to introduce a concept about which no witness admitted knowledge. Assuming *arguendo* that the point should have been read, its absence had very little, if any, impact on the ultimate result in this case. The jury was charged five days after the Court's allegedly erroneous curative instruction and it is doubtful whether any of them remembered the "special parole" questioning and the Court's subsequent statement.

## IX. Charge on Death Penalty.

 Near the conclusion of the charge, the Court stated:

"The punishment provided by law for the offense charged in the indictment is a matter exclusively within the province of the Court and should not be considered by you in any way in arriving at an impartial verdict as to the guilt or innocence of the particular Defendant. The Defendants, if convicted, cannot be subject to the death penalty." (Vol. VIII, Tr. 1975).

The Defendants maintain that inclusion of the last sentence constitutes reversible error because it invited the jury to consider an improper factor during its deliberations. The Court is of the view that, in light of several statements made during closing argument, the instruction was proper or, at least, harmless.

The following remarks by defense counsel all served to implant the question of sentence in the jury's mind:

"In this summation of mine, I'm going to go through, and with each particular witness and with each particular piece of evidence, I'm going to put another drop of ink in that glass of water, and I want you to concentrate as well as you can because you are going to hear four of us, and then hear a short rebuttal from government counsel, and I want you to remember what we say and to think about it very, very carefully because you will be deciding the fate of these men. You will be deciding how they spend the rest of their lives." ( Vol. VIII, Tr. 45) "Think when you go in that Jury room to deliberate; and when you are judging that man's life, think about that testimony. Think if that is reliable. Think if that gives you a reasonable doubt, if that muddies up the water any further." (Vol. VIII, Tr. 50–51).

\* \* \* \* \* \*

"Would you trust people like that [Cutler and Luera] with the lives of these men? Would you find a man guilty beyond a reasonable doubt on that kind of testimony? I submit to you it would be impossible to do so." (Vol. VIII, Tr. 54.)

\* \* \* \* \* \*

"Here is a man [Cutler, who was serving a life sentence] who received the harshest sentence the Federal Judge can give under the Constitution, under the laws as the Supreme Court has interpreted them. His only opportunity to get out of that place, to see the light of day, is to get paroled." (Vol. VIII, Tr. 58).

\* \* \* \* \* \*

"And Mr. Luera and Mr. Cutler got their stories straight. They were wrong before. In the Grand Jury, Mr. Cutler said that Mr. Savage was fighting with Luera. He had to get his story straight with Mr. Luera to make it stick, to cover up their own motivations, their own intentions, and their own lives." (Vol. VIII, Tr. 60–61)

\* \* \* \* \* \*

"Why did he [witness Crow, an admitted friend of the victim Silver] come forth at that late time? I think he feels that he wants to get back—isn't this a logical explanation—he wants to get back; he picked out maybe two people who he thinks might have had something to do with it, at least they are black. He gets rid of four more black persons if he can convince you people." (Vol. VIII, Tr. 79)

From the above-quoted passages, the jury was either left with the impression that the Defendants could be sentenced to death or correctly perceived that the maximum sentence was life imprisonment. If the first be true, the Court's allegedly objectionable instruction was necessary to cure a misapprehension. If the second be true, the charge was harmless.

### X. Verdict Contrary to Weight of Evidence.

In determining the sufficiency of the evidence to withstand a motion for judgment of acquittal, the evidence and all reasonable inferences that may be drawn therefrom must be viewed in the light most favorable to the Government. If it is concluded that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is for the jury. *Mortensen v. United States,* 322 U.S. 369, 374, 64 S.Ct. 1037, 88 L.Ed. 1331 (1944); *Glasser v. U. S.,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *U. S. v. Feldman,* 425 F.2d 688 (3d Cir. 1970). Although the jury was required to clear considerable credibility hurdles, the Court is of the view that, based upon the evidence and the reasonable inferences to be drawn therefrom, it could fairly have reached its verdict. The Government presented more

than minimal testimony which, if believed by the jury, implicated each Defendant in the stabbing of Mark Silver. Despite the absence of apodictical proof this case is not one in which the verdict is unsupported by or contrary to the weight of the evidence.

### XI. Evidence of Premeditation.

Defendants Savage, Shepard and Woodson, who were found guilty of first degree murder, contend that the Government failed to present sufficient evidence to justify those verdicts. They do not contest the proposition that the premeditation necessary to sustain a conviction for murder in the first degree may be established by the facts and circumstances attending the murder. *Government of Virgin Islands v. Lanclos,* 477 F.2d 603, 606 (3d Cir. 1973); *Government of Virgin Islands v. Lake,* 362 F.2d 770 (3d Cir. 1966). As instructed by the Court, the jury was entitled to consider all matters preceding, surrounding, and following the killing which shed light on the condition of the mind(s) of the assailant(s) before and at the time of the act. Furthermore, the Court of Appeals for this Circuit has held that "if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it may fairly be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended." *Government of Virgin Islands v. Lanclos, supra,* at 606; *Government of Virgin Islands v. Lake, supra,* at 776. Viewing the testimony in the light most favorable to the Government, the scenario of the Silver stabbing does not depict a frenzied, impassioned act, but rather an intentional cold-blooded murder. The difficult task for the jury was determining whether a particular Defendant was one of the killers. Once they had reached that conclusion, the question of whether the act was premeditated presented a lesser task.

### XII. Inconsistent Verdicts.

All Defendants contend that the imposition of verdicts in the first degree on Savage, Shepard, and Woodson, coupled

with a verdict in the second degree on Wiggins, demonstrates arbitrary action on the part of the jury. Although the leniency accorded Wiggins is puzzling, the Court finds no ground for reducing the convictions of the other three defendants or for ordering a new trial:

"That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters." *U. S. v. Vastine*, 363 F.2d 853, 855 (3d Cir. 1966). *Dunn v. U. S.*, 284 U.S. 390, 394, 52 S.Ct. 189, 76 L.Ed. 356 (1932).

### XIII. Denial of List of Eyewitnesses (Wiggins).

Defendant Wiggins asserts that the Court's Order of December 3, 1976 which denied his request for the names and addresses of the witnesses upon whom the Government would rely to establish his presence at the scene of the crime and to rebut his alibi witnesses was error which necessitates a new trial.

 Pursuant to F.R.Crim.P. 12.1, if a written demand is made by the Government, the Defendant must give notice of his intention to offer an alibi defense and must state the specific place where he claims to have been at the time of the alleged offense as well as the names and addresses of the witnesses upon whom he will rely to prove such alibi. In return, the Government is required to notify the defense of the names and addresses of the witnesses whom it plans to call to place the Defendant at the scene of the alleged offense as well as any other individuals who will be used to rebut the testimony of the Defendant's alibi witnesses. Rule 12.1(b). Since there was no written demand by the Government under Rule 12.1(a) with respect to Wiggins, the Government's reciprocal obligation was not triggered and his request for the names and addresses of the witnesses upon whom the Government intended to rely to establish his presence at the Silver stabbing and to rebut his alibi witnesses was denied. See Order dated December 3, 1976 in Criminal No. 76–132–2. The Court sees no reason to reconsider its decision.

 Wiggins alludes to 18 U.S.C. § 3432 which provides that an individual charged with a capital offense shall be furnished, *inter alia*, with a list of the witnesses to be produced "on the trial for proving the indictment". However, Wiggins himself cites *Hall v. U. S.*, 410 F.2d 653 (4th Cir. 1969) which holds this statute inapplicable to a case in which the Government expressly disclaims an intention to seek the death penalty. See, also, *U. S. v. Crowell*, 359 F.Supp. 489, 492 (M.D.Fla.1973). On October 18, 1976, the Government filed a waiver of the death penalty in the above-captioned case, thereby severing § 3432's connection to this case.

In the light of the foregoing, an appropriate order denying the Defendants' motions for new trial and judgments of acquittal will be entered.