**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lawrence W. THOMAS, Defendant-Appellant.**

**No. 18455.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1972.

Decided May 2, 1972.

Thomas P. Sullivan, Robert C. Keck, Jr., Chicago, Ill., for defendant-appellant; Jenner & Block, Chicago, Ill., of counsel.

James R. Thompson, U. S. Atty., Samuel K. Skinner, Asst. U. S. Atty., William J. Bauer, U. S. Atty., Chicago, Ill., for appellee; John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., Jeffrey Johnson, Arnold Kanter, Legal Interns., of counsel.

Before SWYGERT, Chief Judge, and CASTLE, Senior Circuit Judge, and STEVENS, Circuit Judge.

SWYGERT, Chief Judge.

This is an appeal from the conviction of Lawrence W. Thomas of mail fraud in violation of 18 U.S.C. § 1341. In the original twelve-count indictment, defendant, an attorney, and George J. Pope, a doctor, were charged with using the mails to defraud several insurance companies. On the Government's motion six counts of the indictment were dismissed against both defendants. Some time later, Dr. Pope's trial was severed from that of Thomas. On the day Thomas' trial began, Dr. Pope pled guilty to the remaining counts and thereafter appeared as a witness for the Government.[1] Thomas was charged with sending fraudulent claims for damages sustained by his clients to insurance companies, including hospital and doctor's bills relating to clients who had not been injured, exaggerated medical reports, and auto repair estimates and bills which were inordinately high. Thomas was found guilty by the jury, fined $5,000 and sentenced to probation for three years, the first sixty days of which are to be served in jail.

The defendant charges error in the judge's determination that the evidence was sufficient to go before the jury. We disagree with this contention. Upon review of the record we conclude that the evidence on each of the counts was such that a jury could find guilt beyond a reasonable doubt. Defendant also points to several errors in the conduct of the trial in addition to challenging the judge's response to testimony that an allegedly prejudicial newspaper article had been present in the jury room and had been used by the jury during its deliberations. Since we agree that constitutional errors surround the trial judge's treatment of this disclosure and require that a new trial be held, we will not deal with the defendant's remaining claims.

The record discloses the following facts: The jury began to deliberate at approximately 1:30 P.M. on November 25, 1969. At 9 P.M. that day the jurors found Thomas guilty and, after the verdict was signed and sealed, the jury was released for the night. At 7:15 the following morning, Mrs. Thomas, the defendant's wife, received a call from a woman identifying herself as Mrs. Kruschka, a member of the jury. Mrs. Kruschka claimed that "something went on last night that was very wrong" and asked to speak with the defendant's attorney. After getting the number from Mrs. Thomas, Mrs. Kruschka called defendant's attorney, Thomas P. Sullivan. Mrs. Kruschka told Mr. Sullivan that several jurors had had copies of a newspaper article about the case which had appeared in the Chicago Tribune on the morning of November 25. She claimed that during the deliberations jurors who chose to vote for conviction argued from the article which they displayed and to which they repeatedly referred. She indicated that several votes were required before all jurors decided to vote for conviction.

Later that morning in court, defendant's attorney reported his conversation with Mrs. Kruschka, and presented the article in question. The article was entitled, *Car Insurance Fraud Trial is Nearing End.* The first two paragraphs reported the stage of court proceedings

[1]. Dr. Pope was sentenced to one year's probation and fined $5,000.

in the Thomas trial and attempted to summarize the testimony of one of the witnesses. In addition, the article stated, "Doctor Pope was indicted with Thomas and five other attorneys in the alleged insurance padding which caused three million dollars in losses to several insurance companies." Mr. Sullivan claimed that this statement referred to matters outside the record and not properly before the jury. He then moved for a hearing to determine the jury's exposure to the article, or for a mistrial. The trial judge denied the motions and instructed the attorneys for both sides not to interview the jurors. After the verdict was read and the jury discharged, Mr. Sullivan filed post-trial motions for a hearing or for a new trial based on his affidavit and that of Mrs. Thomas. The trial judge again denied these motions.

■ Thomas' claim for a new trial rests upon a defendant's sixth amendment right to confront the witnesses against him. Confrontation in open court is critical since it affords a defendant an opportunity to fully contest the prosecution's case in the presence of the jury. An important corollary of this protection is the requirement "that the jury's verdict be based upon evidence received in open court, not from outside sources." Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966); Marshall v. United States, 360 U.S. 310, 312–313, 79 S.Ct. 1171, 3 L.Ed. 2d 1250 (1959). See Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Newspaper and television publicity surrounding a trial represent the most common threats to the integrity of the proceedings. This is not to suggest, however, that juror exposure to any publicity vitiates the fairness of the trial. The severity of the threat depends upon both the nature of the information so publicized and the degree of juror exposure to it. Moreover, the judge's response is to be commensurate with the severity of the threat posed. Margoles v. United States, 407 F.2d 727, 733 (7th Cir.), cert. denied, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). In

numerous cases, we have been required to consider what degree of prejudice must be shown to trigger the court's responsibility to investigate further by specifically questioning the jury; or to institute ameliorative measures, such as continuances or cautionary instructions, and finally, what kind of showing of prejudice will necessitate a new trial. In the instant case, we find that the district court, when presented with evidence indicating that a prejudicial news article was actually present in the jury room and, more importantly, that it was in fact used by some jurors to persuade others, was at the very minimum required to investigate further.

■ This circuit has specifically defined minimal measures a district judge is required to take when confronted with evidence of prejudicial publicity prior to and during a trial. Thus, when apprised in a general fashion of the existence of damaging publicity, the district judge is only called upon to "strongly and repeatedly [admonish] the jury throughout the trial not to read or listen to any news coverage of the case." Margoles v. United States, supra at 733. When the publishing of specific examples of inadmissible evidence is brought to the court's attention, further investigation is required to determine juror exposure to it:

> Thus, the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. 407 F.2d at 735.

See United States v. Accardo, 298 F.2d 133, 136 (7th Cir. 1962). The standard for triggering the requirement of an initial collective inquiry has not been construed strictly. In Margoles, though the testimony related in the article had been ruled inadmissible by the district court, it was far less abusive and prejudicial than the publicity disclosed in Sheppard

v. Maxwell, *supra*. *See* United States v. Solomon, 422 F.2d 1110, 1116–1117 (7th Cir. 1970). Indeed, in United States v. Kamber, 458 F.2d 918 (7th Cir. 1971), we specifically approved of the judge's inquiry after having been apprised of the existence of an article which simply paraphrased the indictment, related that the defendant was and continued to be active in the Young Republicans, and that he had recently escorted Tricia Nixon to one political affair and Julie Nixon to another. Collective inquiry of the jury of the sort required by *Margoles* thus ranks among the most rudimentary of the responses at the judge's disposal. *See, e. g.*, American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, § 3.5 (Approved Draft, 1968).

■ The Government asserts that the instant case does not fall within the rule of *Margoles* because it involves a claim of juror exposure to prejudicial publicity after the trial was completed and a verdict given rather than a claim raised prior to or during trial. It argues that the court should be mindful of the public policy considerations which militate against jurors' impeachment of their own duly rendered verdict. McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915). Though this policy is a weighty one, it has not been held to be an absolute prohibition. The Supreme Court has recently suggested that more important countervailing considerations are provided by the requirements of the sixth amendment. Parker v. Gladden, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966). In *Parker*, the Supreme Court allowed for the impeachment of the verdict where juror testimony indicated that a bailiff had spoken with several jurors in the jury room. The bailiff's remarks consisted only of a general, unsupported statement of opinion, "that wicked fellow . . . is guilty," and an assurance that any error by the jury would be corrected by the Supreme Court. *See* Remmer v. United States, 347 U.S.

227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). Other circuits have followed suit where similar post-verdict claims were raised. *See* United States v. Pittman, 449 F.2d 1284 (9th Cir. 1971); United States ex rel. Owen v. McMann, 435 F.2d 813 (2nd Cir. 1970). In sum, we support the approach outlined in the American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury, § 5.7(c) (Approved Draft, 1968) which states that a juror's testimony or affidavit shall be received when it concerns "whether matters not in evidence came to the attention of one or more jurors, under circumstances which would violate the defendant's constitutional right to be confronted with the witnesses against him."

The Government further argues that even if post-verdict situations generally fall within the ambit of *Margoles* the instant case does not. They contend that the trial judge's failure to investigate the jury was appropriate since the article was "innocuous" and unlikely to prejudice the defendant's case no matter how many jurors may have been exposed to it. We disagree with this characterization of the article.

We are admonished in Marshall v. United States, 360 U.S. at 312, 79 S.Ct. 1171, and in Margoles v. United States, 407 F.2d at 733, to consider each case according to its own special facts. To begin with, we find that the article is prejudicial on its face. It indicates that five other lawyers were indicted with the defendant in "an insurance claim padding scheme," while only one defendant, Thomas, was before the jury. In addition, the article states that insurance companies lost $3,000,000 as a result of the scheme, while the defendant was only being tried for six instances of mail fraud involving approximately $10,250. Neither item was admissible into evidence. Together, they suggested that the defendant, was part of a much larger conspiracy than either the evidence at trial had specifically indicated or than the indictment had charged.

Moreover, the article's impact is all the more telling because of the time at which it was introduced. In United States v. Grady, 185 F.2d 273 (7th Cir. 1950), this court called for a reversal of a conviction when the judge discovered that an affidavit stating that the facts in the information were true was attached to the information itself which the jury was permitted to take into the jury room. We required only evidence that the affidavit "might have operated to the substantial injury of the defendant." In United States v. Kum Seng Seo, 300 F.2d 623 (3d Cir. 1962), testimony of two jurors that a potentially prejudicial newspaper clipping had been shown to other jurors shortly before a vote on the verdict was taken entitled the defendant to a new trial. The timing of the exposure was as important as the contents of the article: "It is of grave consequence . . . that the Newark Evening News article was produced by Mrs. Corsaky and circulated a short time before the voting on the verdict by the jurors. A more critical moment would have been difficult to find." 300 F.2d at 625. The point at which the jury begins to deliberate is a "critical juncture" in the trial proceeding principally because there are fewer opportunities to counteract prejudice at this stage than at any other. An article that may be only marginally prejudicial in any other setting is likely to have a disproportionate impact here.

Finally, the record indicates that the evidence before the trial judge went beyond showing that a potentially prejudicial article had been present in the jury room during jury deliberations. Mrs. Kruschka indicated that the article had in fact been displayed and "used" by some jurors to persuade others. Thus, the trial judge was not called upon to infer influence from juror exposure to a potentially prejudicial article; there was direct evidence to that effect. However "innocuous" the article may have appeared to the Government or to the judge from their respective vantage points, it apparently did not appear so to the jurors.

We find that there was a sufficient showing of juror exposure to prejudicial evidence to have prompted further investigation on the part of the trial judge. As in United States v. Palermo, 410 F.2d 468 (1969), we find that this failure necessitates a new trial. Remand for the purposes of investigating the jury would be fruitless at this point, over two years after the close of the original proceeding. Moreover, we cannot agree that an error of this gravity, which calls into question the integrity of the jury's deliberations, can be characterized as "harmless," under Chapman v. California, 386 U.S. 18, 82 S.Ct. 824, 17 L. Ed.2d 705 (1967).

Accordingly, we reverse the conviction and remand with directions that a new trial be held.

STEVENS, Circuit Judge (dissenting).

The question for us to decide is whether the trial judge abused his discretion in concluding that the article was not sufficiently prejudicial to require a new trial. Since the jury had already arrived at its verdict, it was too late to take remedial steps. The fact that improper matter was considered by the jury was established; hence there was nothing to be accomplished by an investigation unless the judge questioned the veracity of the affidavit.[1] The issue presented to him was whether, on the special facts of this case, a new trial should be held.[2]

---

1. See United States v. McKinney, 429 F. 2d 1019, 1030–1031 (5th Cir. 1970).

2. "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021. Generalizations beyond that statement are not profitable, because each case must turn on its special facts." Marshall v. United States, 360 U.S. 310, 312, 79 S.Ct. 1171, 1173, 3 L.Ed. 2d 1250 (1959).

Necessarily his decision reflected an evaluation of the newspaper story in the context of the entire trial.

The record here is cold, but it contains substantial support for the decision made by the trial judge while his recollection of the demeanor of witnesses, the voir dire, and the persuasive impact of testimony and argument, remained vivid.

Defendant's guilt is starkly apparent. Moreover, the substance of the news story was brought to the jury's attention by defense counsel. On cross-examination Dr. Pope acknowledged that similar referrals from other personal injury lawyers provided him with his major source of income and that he saw between 30 and 40 patients per day. He evaded defense counsel's question about "a number of other indictments." The record developed by defendant thus indicated, if it did not explicitly describe, the existence of wide-spread insurance padding by Dr. Pope and lawyers other than defendant which had resulted in the return of several indictments.

The theory of the defense was that defendant was not a participant in the scheme, or, more narrowly, that the specific charges against him had not been proved beyond a reasonable doubt. This defense, though not contradicted by the news story, may well have been prejudiced by the estimate that insurance padding amounted to $3,000,000. I find it difficult to assess the extent of the prejudice; I am persuaded, however, that the probability of significant prejudice is not plain enough to warrant disagreement with the contemporaneous evaluation made by an experienced trial judge. Indeed, even disagreement with a discretionary ruling would not establish error.

Almost every jury trial requires some compromise with standards of absolute perfection; such deviations must be tolerated if the jury system is to function effectively.[3] In my opinion the trial judge did not abuse his discretion in concluding that the deviation reflected by this record was within permissible limits.

3. "On the other hand, it would be impracticable to impose the counsel of absolute perfection that no verdict shall stand, unless every juror has been entirely without bias, and has based his vote only upon the evidence he has heard in court. It is doubtful whether more than one in a hundred verdicts would stand such a test; and although absolute justice may require as much, the impossibility of achieving it has induced judges to take a middle course, for they have recognized that the institution could not otherwise survive; they would become Penelopes, forever engaged in unraveling the webs they wove. Like much else in human affairs, its defects are so deeply enmeshed in the system that wholly to disentangle them would quite kill it." Jorgensen v. York Ice & Machinery Corp., 160 F.2d 432, 435 (2d Cir. 1947).