| Source | Location | Order No. | Date of FR Proposal | Regulation involved | Final compliance date |
|--------|----------|-----------|---------------------|---------------------|------------------------|
| Bethlehem Steel Corporation | Burns Harbor, Indiana | None___ | 3-7-79___ | APC-3, APC-5 | 7-1-79 |

**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Garrett Brock TRAPNELL and Martin
Joseph McNally,
Defendants-Appellants.**

**Nos. 79–1225, 79–1226.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1980.

Decided Dec. 30, 1980.

Prof. Allen E. Shoenberger (argued), Kristine A. Olson, David K. Schmitt (on the brief), Chicago, Ill., for defendant-appellant Trapnell.

John H. Mathias, Jr., Chicago, Ill., for defendant-appellant McNally; Carol R. Thigpen, Jerold S. Solovy and Jenner & Block of counsel.

Clifford Proud, U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and SKELTON, Senior Judge.*

FAIRCHILD, Chief Judge.

Defendants-appellants Garrett Brock Trapnell and Martin Joseph McNally appeal from their convictions, after jury trial, on counts of conspiracy to escape from prison, in violation of 18 U.S.C. § 371 (Count 1); attempted escape from prison, in violation of 18 U.S.C. §§ 2 and 751(a) (Count 2); aiding and abetting the aircraft piracy of a helicopter in violation of 49 U.S.C. § 1472(i) and 18 U.S.C. § 2 (Count 4); and aiding and abetting the kidnapping of the helicopter's pilot in violation of 18 U.S.C. §§ 2 and 1201(a) (Count 5). We reverse the convictions of both defendants on the air piracy and kidnapping charges; we reverse as to McNally because of insufficient evidence and we reverse as to Trapnell and remand for a new trial. We affirm the convictions of both men on the charges of conspiracy to escape and attempted escape.

This case arises out of an attempted prison escape at the United States Penitentiary at Marion, Illinois, in the early evening of May 24, 1978. A helicopter piloted by Alan Barklage landed near the front entrance to the prison at 6:15 p. m. that evening, with a mortally wounded passenger, Barbara Oswald. Barklage explained that Oswald had hired his helicopter ostensibly to look at real estate in eastern Missouri and southern Illinois but had forced him at gunpoint to take the helicopter to the prison at Marion to pick up three prisoners waiting at a specified location within the prison. According to the pilot, he had managed to take the gun away from Oswald and had shot her to death when she was reaching for other weapons. Evidence presented at trial indicated that defendants here and another prisoner James Kenneth Johnson [1] were in the area designated by Oswald to Barklage for his landing (an area off limits to prisoners without official permission), that one of the prisoners put on the ground a yellow jacket as Barklage testified Oswald had said one of them would do, and that the prisoners wore or carried clothing and other items likely to be useful to them upon escaping.

## SUFFICIENCY OF THE EVIDENCE

██ Both the defendants contend that there was insufficient evidence to support their convictions on Counts 4 (aircraft piracy) and 5 (kidnapping).[2] Both complain that various instances of alleged prosecutorial misconduct denied their rights to a fair trial. Each individually raises several other issues, discussed *infra*.

In considering appellants' sufficiency of the evidence arguments, we must view the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The test for sufficiency of the evidence is whether, taking the view most favorable to the government, reasonable minds could conclude the evidence is sufficient to prove the guilt of the defendants beyond a reasonable doubt.

---

* Senior Judge Byron G. Skelton of the United States Court of Claims, sitting by designation.

1. Johnson and his friend co-defendant Beth Meadows were permitted to sever their trials on the second day of trial. Johnson pleaded guilty to the conspiracy to escape and attempted escape counts; he denied any knowledge of the alleged hijacking and the court dismissed the air piracy and kidnapping counts against him. Meadows pleaded guilty to a charge of conspiracy to escape; the other charges against her were dismissed.

2. Although Trapnell's brief on this issue considers the matter in terms of a failure to adopt a proposed instruction regarding specific intent required for both of these charges, the argument must be considered also as an attack on the sufficiency of the evidence. At oral argument Trapnell's counsel treated this issue as attacking the sufficiency of the evidence.

18 U.S.C. § 2(a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal." This court has referred to the Learned Hand formulation of the definition of aiding and abetting. It requires that the defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Greer*, 467 F.2d 1064, 1068–69 (7th Cir. 1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973) (citing *United States v. Peoni*, 100 F.2d 401, 402 (2nd Cir. 1938)).

The government argues that the evidence was sufficient for the jury to find McNally guilty beyond a reasonable doubt of air piracy and kidnapping. McNally was attempting escape and was in the restricted portion of the penitentiary towards which Oswald was forcing the helicopter pilot to guide his craft. Oswald had mentioned McNally's name in a conversation prior to the attempted escape. Inmate Michael Marchetto testified concerning a conversation he had with McNally in the evening of May 24, after the escape attempt failed. Correctional officer Jose Vazquez related a conversation he overheard between McNally and another prisoner two months after the escape attempt.

The evidence of McNally's guilt on Counts 1 and 2, while very convincing, help prove the plan to have the helicopter available, but falls short of proving knowledge of the details of the relationship between Oswald and the pilot. Although it has been proved that McNally was expecting to escape in the helicopter, the government was required to prove beyond a reasonable doubt that the helicopter would be brought to the prison through air piracy and kidnapping and that McNally had encouraged or

assisted the commission of those crimes. That Oswald mentioned McNally's name shows that she was aware of his existence and may have been evidence confirming his guilt on Counts 1 and 2, but it has no bearing on Counts 4 and 5.

Inmate Marchetto testified that Trapnell told him the night of May 24 that he was locked up in the segregation unit because of his participation in the abortive attempt, that the escapers had intended to proceed to a nearby airport where there were guns and clothes and a car, that they had planned to take another flight from Kentucky, and that they would have carried out some robberies in New Orleans. Once again, this evidence is not probative of anything connected with the air piracy and kidnapping charges.

The final piece of evidence advanced by the government is the Vazquez testimony, regarding overheard conversations between McNally and another prisoner on July 18 and 19. Helicopter pilot Barklage had testified that Oswald, while holding him at gunpoint during the flight, had showed him handcuffs and said they would be used on him. Vazquez's testimony about handcuffs was as follows:

"Q. Do you recall hearing Mr. McNally say anything concerning handcuffs?

A. Yes, he says that this lady is supposed to have some cuff with her, to cuff people."

Assuming that Vazquez was a witness whose testimony the jury found credible, we cannot find that this single comment of McNally, made two months after the escape attempt, is sufficient evidence to prove beyond a reasonable doubt that McNally aided and abetted in the air piracy and kidnapping.

On the contrary, the evidence against Trapnell [3] on the air piracy and kidnapping charges is more substantial than that

---

**3.** The government points to evidence of Trapnell giving Oswald a valuable watch to sell and writing to his ex-wife in Canada to have his clothes sent for use in his escape. Wanting clothes and money is understandable planning for one about to escape. No clear connection

exists, however, to the air piracy or kidnapping charges. Although the purchase of weapons is consistent with the intention to kidnap a pilot and hijack his helicopter, the weapons are also instrumental in the longer-term escape plan.

against McNally. Trapnell corresponded with and met with Oswald on numerous occasions, the last being the morning of the escape attempt. The government argues that the jury could infer that Trapnell and Oswald discussed all of the details of the escape attempt, including the means (air piracy and kidnapping) by which the helicopter would be brought to the prison. Had the escape been by a stolen car rather than a helicopter, we would not find credible any inference that the prisoner planning the escape inquired whether the co-conspirator would obtain the car by theft. Cars are in common use in the country, are easily obtainable legally, and are owned by most of the nation's adult population. A great majority of American adults are licensed to drive automobiles. In contrast, only a small minority of people in this country own or have access to helicopters, and few people can pilot one. Of those who have helicopters available for use and can pilot them, few would voluntarily use a helicopter to effect an escape from prison. The evidence of Trapnell's plans and conspiracy to escape is clear and uncontested; we believe a jury would have been justified in concluding that Trapnell, by meetings and correspondence, knew of and encouraged the planned air piracy and kidnapping.

The testimony of Marchetto about a conversation with Trapnell, two months after the escape attempt, provides further evidence of Trapnell's prior knowledge of Oswald's inability to pilot a helicopter and of her design to carry out the escape by means of air piracy and kidnapping. Marchetto testified as follows:

> He [Trapnell] told me that there had been $5,000 sent to finance this thing, and I asked Kenny—I mean Trap, "well, why didn't you send Barbara to Louisiana, Florida, Texas, somewhere away from this area to take helicopter lessons so that she could have flown in herself instead of having to take the chance of taking a hostage and depending on somebody

else?" And he told me that it was a time element; at the time they were constructing a new tower in the front of the institution, and he was worried it would be manned before she could have completed it and gotten back.

Considering the Marchetto testimony, together with the Trapnell-Oswald meetings and correspondence and the inferences to be drawn from them, we find that the jury's verdict of guilt as to Trapnell on the air piracy and kidnapping counts was supported by sufficient evidence to establish his guilt beyond a reasonable doubt.

## PREJUDICIAL TRIAL PUBLICITY

Defendant McNally argues that the district court erred in denying his motions to sequester the jury and to question jurors regarding allegedly prejudicial trial publicity.

Immediately after the district court granted Meadows' and Johnson's motions for severance on December 14, Trapnell [4] requested that the court ask each juror the following morning whether he or she had read the evening newspapers, presumably for the purpose of discovering whether any juror had read any news report about the guilty pleas of the severed defendants. The court denied the motion. That evening two local newspapers, the Benton *Evening News* and the *Southern Illinoisan*, printed articles about the changes of pleas, severance, and related testimony. The *Evening News* article mentioned the charges for which the incarcerated defendants (McNally, Trapnell & Johnson) were currently in prison. The parties had stipulated at trial that these defendants were lawfully in custody at the prison but that the charges on which they were incarcerated would not be brought to the attention of the jury. [5]

In a news report on Radio Station WDDD on December 14 or 15, according to the McNally brief, an attorney close to this case

---

4. Judge Baker had ruled more than once that *any objection made by one defendant would be considered as made by all defendants.*

5. Both McNally and Trapnell were serving sentences for air piracy; Johnson was incarcerated for bank robbery.

had stated that McNally and Trapnell were offered the same deals as Meadows and Johnson; the report allegedly indicated that, as Trapnell and McNally were just as guilty as the other two defendants, the attorney could not understand why Trapnell and McNally did not accept the deal. On December 18, McNally moved for a mistrial, requesting the trial court to "question each juror regarding the publicity in this case," and suggesting several questions to be asked. McNally's motion and the arguments in his brief concentrate on possible prejudice to him from the radio broadcast. One suggested question was whether any juror heard or saw any news report about the trial and whether any juror learned from a news report of what charges either McNally or Trapnell was currently convicted.

■■■ This court has made clear what a trial court is required to do when prejudicial publicity occurs during a criminal trial:

> [T]he procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he had read or heard any of the publicity in question, the judge is not required to proceed further.

*Margoles v. United States*, 407 F.2d 727, 735 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969).

■■■ The government points out that the trial court carefully questioned the jurors during *voir dire* about their knowledge of the facts involved in this case and that the trial court repeatedly admonished the jury not to read or listen to accounts of the trial, or to discuss the case with anyone. We recognize the care shown by the trial court in these matters but do not consider these steps sufficient to protect a jury from prejudicial trial publicity. In *Margoles*, as in the case before us, the news reports appeared in the same community where the trial was being held and thus may reasonably be believed to have come to the attention of jurors.

The newspaper and radio reports objected to by McNally contained several pieces of information which were not known to the jury; these improper matters were 1) the guilty pleas of Johnson [6] and Meadows; 2) the nature of the charges for which McNally and Trapnell were currently incarcerated; 3) that a deal had been offered to the remaining defendants, who had rejected it; and 4) that an attorney close to the trial declared that as all of the defendants were equally guilty, the attorney did not understand why Trapnell and McNally had rejected the deal accepted by Johnson and Meadows.

In *United States v. Daddano*, 432 F.2d 1119 (7th Cir. 1970), *cert. denied*, 402 U.S. 905, 91 S.Ct. 1366, 28 L.Ed.2d 645 (1971), this court considered a case similar to the one before us. During trial the judge was notified of more than fifty articles from local papers discussing the trial, but refused defendants' requests to have the jury questioned to determine whether any had read them and what prejudicial effect they had had. Relying on the presumption that the jurors had obeyed his frequent admonitions to the jury that it avoid newspaper, radio, or television commentary about the trial, the trial court declined to question the jurors. This court held that the trial court's refusal to question the jurors "clearly does not comply with ... *Margoles v. United States.*" *Id.* at 1127.[7]

---

6. We recognize that Johnson's guilty pleas to the charges of conspiracy to escape and attempted escape did become part of the record when Trapnell called Johnson as a witness and asked him about those pleas. McNally did not object to that testimony.

7. The trial in the *Daddano* case was held several months before this court decided *Margoles*. This court did not apply *Margoles* retroactively and affirmed the convictions in *Daddano* after finding that the trial court had properly complied with the pre-*Margoles* requirements. *Id.* at 1128.

■ The burden of making an objection to prejudicial publicity during trial is on the defendant. *United States v. Werbrouck,* 589 F.2d 273 (7th Cir. 1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979). Trapnell's request on December 14 that the jury be questioned the following day regarding possible exposure to news reports regarding the court proceedings of December 14 was properly denied as premature. However, McNally's December 18 motions met the burden; therefore the trial court was required to follow the *Margoles* procedure.

The government does not discuss *Margoles* but instead cites several decisions of this and other circuits which we do not consider controlling. *United States v. D'Andrea,* 585 F.2d 1351, 1357 (7th Cir. 1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1795, 60 L.Ed.2d 244 (1979), is cited for the proposition that questioning of the jurors is not required when one newspaper article appeared in a non-local newspaper. Here, to the contrary the news reports were in newspapers and on the radio in the area where the trial took place. The government's reliance on *United States v. Werbrouck, supra,* is misplaced; *Werbrouck* requires the defendant to bring the prejudicial trial publicity to the court's notice but does not, as argued by the government, require the defendant to show that the jury was actually exposed to any of the publicity.

■ Although the trial court here clearly failed to follow *Margoles,* that failure does not require reversal of convictions on all the charges. In *United States v. Taylor,* 569 F.2d 448, 454 (7th Cir.), *cert. denied,* 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978), the trial court refused to question the jury about its possible exposure to a local newspaper story report that the defendant had been armed at the time of his arrest. This court indicated that "it would have been advisable to ask the jurors collectively whether any of them had seen any references to the trial in the paper . . . ." *Id.* at 454.

The *Taylor* court, however, found that the failure to question did not constitute plain error affecting the substantial rights of the defendant in light of the trial court's repeated admonitions to the jury to avoid news coverage of the trial; in addition, the report of being armed was not probative of defendant's guilt of the charges of tax evasion and this report, although potentially damaging, was not evidence previously suppressed by the court. *Id.,* citing *United States v. Thomas,* 463 F.2d 1061, 1063 (7th Cir. 1972). In *Thomas,* this court reversed a conviction where the trial court failed to question the jury about a prejudicial article which the trial court was informed had been displayed in the jury room during jury deliberations and used to persuade other jurors. The present case falls between the situations in *Taylor* and *Thomas.*

If they reached the jury, the newspaper and radio reports may have deprived both McNally and Trapnell of a fair trial on the aircraft piracy and kidnapping charges. Had the jury learned that Trapnell and McNally were both currently incarcerated for air piracy, that knowledge may have prevented the jury from weighing fairly the evidence on the instant air piracy and related kidnapping charges. Unlike the situation in *Taylor,* the nature of the prior convictions was kept from the jury by stipulation. We cannot say with certainty that the jury would have been able to consider fairly these charges if it had heard the radio broadcast or seen the newspaper reports.

As to the conspiracy to escape and attempted escape convictions of both men, the situation is different. On both charges the evidence against both men was overwhelming. Both men, along with Johnson, went to an unauthorized point in the prison to which their co-conspirator Oswald attempted to force the helicopter pilot to go. When the helicopter reached the prison, the three men attempting escape were in that place. Trapnell and Johnson had arranged for outside help and supplies to bring about the

escape. Trapnell and McNally spoke afterward to other prisoners about the attempt. As prearranged, one of the prisoners put a yellow jacket on the ground at the scene of the attempt. Trapnell was shown to have waved to attract the helicopter to reach him. McNally carried items to be used in the escape.

Not only was the evidence against the two defendants overwhelming, but also both men virtually admitted their guilt on these charges although they had pled not guilty. Trapnell repeatedly indicated at trial and on appeal that he did not contest the conspiracy to escape and attempted escape charges. McNally's attorney in closing argument failed to contest his client's guilt on these two charges.[8] The great thrust of his defense was to attack the air piracy and kidnapping charges rather than the other two charges.

Although we recognize that the news reports would have been prejudicial to McNally and Trapnell if the jury heard or read of them, we do not find that that possible prejudice denied them a fair trial under the circumstances of the overwhelming evidence against them on these two charges and their virtual acquiescence in the guilt as to conspiracy to escape and attempted escape. Accordingly, we find that the trial court's failure to follow *Margoles* did not deprive McNally and Trapnell of a fair trial on Counts 1 and 2.

## PROSECUTORIAL MISCONDUCT

Both McNally and Trapnell point to four instances of alleged prosecutorial misconduct causing denial of their right to a fair trial. We find no merit in these contentions.

8. We are aware that McNally points to this argument as indicative of his attorney's incompetence. We consider that argument *infra* and reject it.

9. Q. Would you state your name, please?
A. Betty Viola Meadows.
Q. Where did you reside in May of 1978?
A. 407½ Anoil.
Q. Do you know Kenneth Johnson?
A. Yes.

The first instance involved the prosecution's calling Beth Meadows to testify after charges against her had been severed from the trial. When the prosecution attempted to admit Meadows' grand jury testimony into evidence, the court sustained objections to testimony until such time as Meadows refused to testify and thus became an "unavailable declarant" so that the grand jury testimony would be admissible under Fed.R. Evid. 804. Next, the government called Meadows to testify before the jury, but she invoked her Fifth Amendment right not to testify. Neither defendant objected to Meadows' being called to testify before the jury but both now claim that she should have been called to testify with the jury removed so that her invocation of the constitutional privilege would not prejudice the remaining defendants.

In *United States v. Foster*, 478 F.2d 1001 (7th Cir. 1973), this court stated that "reversible error occurs only where the government intentionally forces the witness to invoke the privilege [against self-incrimination] with the result that an inference unfavorable to the accused is planted in the minds of the jurors." *Id.* at 1004. Here the government had knowledge of Meadows' intent to assert her Fifth Amendment privilege, but her doing so did not create an inference unfavorable to the accused. The questioning of Meadows [9] did not present to the jury information that "may well have been the equivalent in the jury's mind of testimony." *Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965). Nor did the questioning here rise to the level of prejudice to defendants' rights which would require reversal. *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22

Q. You were named in the indictment, which is the subject of this case? [Repeated Twice]
A. Just a minute. Can I talk to my attorney? [Court allowed Meadows to confer with counsel]
Q. I will repeat the question. How did you know James Kenneth Johnson?
A. I don't want to testify.
Q. On what basis.
A. I take the Fifth Amendment.
Court: You may step down.

L.Ed.2d 684 (1969) (not reversible error where the prosecutor's opening remarks summarized a confession of a co-defendant who later refused to answer any questions.) In light of the lack of prejudice to defendants, we find no clear error in allowing the brief testimony of Meadows before the jury. Nor was there error in the trial judge's failure to give a cautionary instruction [10] to the jury that Meadows' invoking her privilege should not be construed as unfavorable to Trapnell and McNally.

■■ Defendants allege plain error in permitting the testimony of one of the prosecutors as a witness. Assistant United States Attorney Marsha L. Johnson briefly, and without objection, took the stand to testify regarding the chain of custody of some letters from a Canadian citizen in Montreal, Canada, to defendant Trapnell. Defendants argue, and we agree, that appearance of counsel as a witness is improper except in extraordinary circumstances. *See Christensen v. United States*, 90 F.2d 152 (7th Cir. 1937). The testimony was of a formal nature, on an uncontested matter, and assertedly could not have been provided by another witness. Under these circumstances, we find no clear error arising from the prosecutor's testimony.

As another instance of prosecutorial misconduct defendants allege that prosecutor Johnson intentionally misled the jury in her closing argument concerning the testimony of severed co-defendant Johnson. When co-defendant Johnson was called to the stand by Trapnell, Johnson testified that "we did plan to escape, and did try to escape .... [W]e did, in fact, on May the 24th go to an area in the prison where we knew a helicopter was coming to pick us up to try to escape .... [I]t was my truthful belief that the helicopter was not hijacked ...."

At closing argument the prosecutor stated, regarding Johnson's testimony:

And you also have to disregard the defense witness, Kenny Johnson. You heard him testify that he'd pled guilty to conspiracy to escape and also the attempted escape, and he also testified his explanation for this, that is, he conspired with Mr. McNally, Mr. Trapnell, to escape. And that he knew what the plan was; that he knew what was involved in this plan, and that he knew how this escape was going to be accomplished. And he knew all of this at least a week before May 24th, 1978.

■ It is a fundamental rule that argument is limited to facts in evidence. *United States v. Fearns*, 501 F.2d 486 (7th Cir. 1974). Defendants argue that the prosecutor's reference to the "plan" and to "how this escape was going to be accomplished" refer to the air piracy and kidnapping. It is clear that Johnson never testified that he knew of those crimes before they occurred; in fact he specifically testified to a belief that the plane was not hijacked.

Later in the closing argument the government referred to Johnson's testimony that "all three were planning the escape, at least prior to, a week prior to May 24, 1978." That statement appears to limit the characterization of Johnson's testimony to a plan to escape. The argument immediately following this phrase, however, stated: "[T]his plan was to hijack a helicopter, and you can believe this plan was to kidnap and take Alan Barklage as hostage." The close proximity of these references to a plan may have left the jury with the mistaken impression that the testimony of Johnson admitted complicity in a plan to hijack and kidnap.

■ We are confronted not with a clear misstatement of fact by the prosecutor as in *Fearns*, but rather with an accurate statement of facts subject to two interpretations, one of which would be possibly prejudicial to the defendants. We do not find that this ambiguity in the prosecutor's argument constituted gross misconduct requiring reversal under the plain error rule.

The fourth claim of prosecutorial misconduct relates to the government's argument on rebuttal. According to the defendants,

10. No such instruction was requested by defendants.

the prosecutor misstated the government's burden of proof by telling the jury that "in order to believe that Mr. McNally did not wilfully commit the crimes charged, you'll have to not believe and totally disregard the testimony of several witnesses [who were subsequently mentioned by name]." Defendants correctly state that the burden of proof as to the crimes charged remained with the government throughout the trial. It is their contention that the jury was told by the prosecutor that acquittal would be proper only if the jury found these witnesses to have been lying. No objection was made at trial to the prosecutor's comments.

▮ In considering whether a prosecutor has erroneously misstated the law, we look not to the prosecutor's intent but rather to what the jury probably thought. *United States v. Phillips*, 527 F.2d 1021, 1023 (7th Cir. 1975).

▮ The closing arguments of the defendants challenged the veracity of some of the prosecution's witnesses. In rebuttal, the government mentioned the substance of the testimony of several witnesses, including defense witness Johnson. The prosecutor's remarks about disregarding and disbelieving testimony constituted references to the evidence unfavorable to the defendants but we do not read their remarks as stating that the burden of proof had shifted to the defendants. We note also that the trial court's instructions unambiguously place the burden of proof on the government. Having reviewed the record as a whole, we find no prosecutorial misconduct which can be said to constitute plain error. *United States v. Micklus*, 581 F.2d 612, 617 (7th Cir. 1978).

## RIGHT TO COUNSEL

Both defendants raise claims of violations of their Sixth Amendment right to counsel. McNally claims that his right to represent himself was abridged by the trial court improperly informing him that once he chose *pro se* representation he would not be allowed subsequently to change his decision. McNally further claims that he received inadequate representation of counsel. Trapnell did represent himself and was assisted by court-appointed standby counsel. He argues that the record does not show that the trial court adequately instructed him about the dangers and disadvantages of *pro se* representation. Trapnell further claims that the court did not allow him sufficient time to prepare his defense. We reject all of these contentions.

The court advised McNally that he had the right to represent himself but that once he made that decision he would not be allowed to withdraw halfway through trial. After McNally made a comment objecting to this statement and indicated that under this requirement he would accept the court-appointed counsel, the court clarified its ruling to indicate that McNally could not have hybrid representation consisting of sometimes acting *pro se* and sometimes being represented by counsel.[11]

11. The relevant colloquy was as follows:

The Court: If you elect to represent yourself, you will have the assistance of those lawyers to advise you: Mr. Giamanco and Mr. Neubauer, but you will have to question the witness and you will have to argue the case, and you will have to make the opening statement. And you are not going to withdraw halfway through the trial.

Now realizing the burden, did you want to assume that burden and represent yourself? Which is your constitutional privilege.

Defendant McNally: Under the circumstances, I would certainly like to proceed pro se as my own counsel representing myself. However, I really don't feel that under those circumstances I can. That at any time during the proceedings I am entitled to withdraw myself and allow my court-appointed attorneys to assume or re-assume representation. And since the Court has clearly and specifically stated that I cannot withdraw at any time, I will take exception to that and give it to these incompetent Court-appointed attorneys who have refused to submit motions that I demanded and ordered them to file. I have nothing more to say but I will take exception to your—

The Court: Thank you, Mr. McNally. Don't misinterpret what I said. What I said is, you are not going to go both ways, you are not going to represent yourself from time to time and have the lawyers represent you from time to time. You must elect to go one way or the other, and whatever you do is all right with me. You can represent yourself or

[redacted] A defendant in a criminal trial has the right to represent himself or to be represented by counsel, but there is no constitutional right to hybrid representation—the representation at the same time by counsel and *pro se.* *See United States v. Daniels,* 572 F.2d 535, 538 (7th Cir. 1978) and cases cited therein. *See also* 28 U.S.C. § 1654. The trial court's statement to McNally, with the clarification made by the court, merely stated this rule and did not deny McNally any constitutionally-guaranteed right.

The right to *pro se* representation was recognized in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In *Faretta,* the trial court had initially allowed the defendant to represent himself but subsequently ruled that Faretta had showed himself unable to conduct his own defense and consequently appointed counsel to represent him against his will. The Supreme Court found the trial court's denial of Faretta's right to self-representation violated the Sixth and Fourteenth Amendments to the Constitution.

[redacted] In a footnote the *Faretta* court indicated that the state may appoint standby counsel, even over the defendant's objection, "to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." [12] McNally claims that the court's alleged choice between *pro se* representation or representation by counsel is contrary to this language in *Faretta.* This *Faretta* language is placed in a footnote indicating that a *pro se* defendant may be denied the right to continue self-representation as a result of engaging in serious and obstructionist misconduct. By having standby counsel ready in such an instance, the trial court has prevented the misconduct of the defendant from resulting in a mistrial. The possibility of misconduct causing a disruptive *pro se* defendant being stopped from self-representation is a different matter from the issue involved here. For the two defendants in this trial who did elect self-representation, Trapnell and Johnson, the court appointed standby counsel and permitted the defendants to confer with those counsel. Had there been serious disruption by either of the *pro se* defendants, the standby counsel would have been available to keep the case proceeding without undue delay or mistrial. The requirements of *Faretta* were fully met.

[redacted] McNally asserts that he received inadequate representation of counsel. In order to reverse a conviction on the basis of ineffective legal assistance, we must find that the counsel's assistance failed to meet "a minimum standard of professional representation." *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 641 (7th Cir.), *cert. denied sub nom. Sielaff v. Williams,* 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1975). There is a presumption of adequate representation, which the appellant has heavy burden to rebut:

> In considering a claim of ineffective assistance of counsel "we start with a presumption that he was conscious of his duties to his clients and that he sought conscientiously to discharge those duties. The burden of demonstrating the contrary is on his former clients."

you can have the lawyers represent you. Now what is it you choose to do?

Defendant McNally: Your Honor, I just stated quite clearly that your interpretation of Barretta [Faretta] is incorrect: That at any time during the proceedings I can withdraw myself and turn it over to the Court-appointed counsel to re-assume the representation of me. But since you tell me that I cannot do this, I will take exception to that.

The Court: Do you accept the Court-appointed counsel or do you want to represent yourself?

Defendant McNally: Under the circumstances I have no alternative but to accept these incompetent attorneys whom you assigned to me.

The Court: The Court interprets—

Defendant McNally: And I take exception to what you stated as Barretta and your interpretation of it.

12. 422 U.S. 834–35 n.46, 95 S.Ct. 2541 n.46.

*United States v. Fleming*, 594 F.2d 598, 606–07 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979), *quoting Matthews v. United States*, 518 F.2d 1245, 1246 (7th Cir. 1975). We do not find that McNally has succeeded in overcoming the presumption of adequate assistance of counsel.

Two of McNally's objections to the actions of his counsel refer to decisions regarding tactics. McNally claims that his counsel belittled his client by indicating in opening argument that the defendants were "not angels" and that "the beautiful thing about our system of government [is that] ... even Martin Joseph McNally has a right to a trial by jury." We frequently encounter instances in which trial counsel indicate the imperfections of their clients in order to advance the argument that a fair trial requires that the clients be judged not on their general character or behavior but on the specific crime being charged. As the jury was informed, McNally was currently serving a prison sentence. He was shown by overwhelming evidence during the trial to have been guilty of conspiracy to escape from prison and attempted escape. His counsel had not exaggerated in indicating that McNally was no angel. We find no proof of ineffective assistance of counsel in the use of this trial tactic. Nor do we find any such proof in the closing arguments to the jury in which counsel for McNally indicated that his client was guilty of conspiracy to escape and attempted escape but that the proof of those charges did not suffice to prove his guilt on the air piracy and kidnapping charges.[13] This tactic of admitting what the evidence strongly demonstrates at the same time as denying other elements or other crimes before the jury is also familiar to this court and we find no error in counsel's use of the tactic.

Several of the specific acts or omissions alleged to constitute ineffective assistance of counsel refer to failure of counsel to object to the matters alleged to be examples of prosecutorial misconduct. Because we have found that those matters did not constitute prosecutorial misconduct, we find that the failures to object do not show ineffective assistance of counsel.

Neither the refusal of counsel to raise various objections or follow other instructions suggested by McNally, nor the failure of one of the counsel to appear at the sentencing, show a failure to provide McNally with counsel adequate to meet constitutional requirements.

 Two points raised by McNally, however, are more troubling. In final argument, McNally's counsel indicated that "if you believe Mr. Marchetto, there is some indication of specific intent [required for conviction on the air piracy and kidnapping charges]." McNally's counsel failed to object or disagree with the comment in Trapnell's closing argument that "if you want to believe Alan Barklage's whole story, they you have to find us guilty." It would have been in McNally's interest for his counsel to not only attack the credibility of Marchetto but also to argue that even if the jury found all of the government's witnesses to be credible that nevertheless the government had failed to prove its case regarding air piracy and kidnapping. In addition, it was in McNally's interest to have the jury ignore the case against Trapnell in deciding on the charges against McNally. This court's standard for judging the effective assistance of counsel recognizes that a trial attorney, subject to the great demands and pressures of trial, is likely to take actions which could be improved by hindsight. We have considered the entire course of counsel's representation of McNally and find that the constitutional standard for representation has been met.

---

**13.** The closing argument reads, in pertinent part:

> Now, again, just as I indicated at the very beginning, it is easy, once you believe this, if you believe this, and it seems to me it's true, he was in this area, I don't think there's any

doubt about it. The question then remains is he therefore guilty of air piracy, and is he, therefore, guilty of kidnapping? Where is that evidence, I ask you. Once again, where is that evidence that he specifically intended to do those things?

■ Trapnell claims that the trial judge failed to ensure that he voluntarily and intelligently waived his right to counsel. At the arraignment, the magistrate advised Trapnell of his right to be represented by counsel or to represent himself, of the technical nature of much of the trial, and of the assistance which would be available to him from the standby counsel. Trapnell signed a written waiver of counsel. Although the trial court never advised Trapnell as to the dangers and disadvantages of self-representation, the court did give such advice to defendants McNally and Johnson at a time when Trapnell was present in court. Although we believe that a fuller explanation of the drawbacks of self-representation should have been made by the trial court to Trapnell, we find that the record establishes that Trapnell's decision to represent himself was made intelligently and with knowledge of the dangers and disadvantages of self-representation, as required by *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975).

Next, Trapnell asserts that he was denied due process of law by being prevented from preparing an effective defense. Responding to several Trapnell motions complaining of interference by prison officials with his use of the law library and his ability to communicate with attorneys and potential witnesses, the district court issued guidelines to the prison officials on November 10 regarding Trapnell's preparation of his defense. The November 10 order permitted Trapnell two five-minute business calls daily, adequate writing materials, unlimited written correspondence with the standby counsel, unlimited correspondence with potential witnesses outside the prison, supervised visits with material witnesses inside the prison, a minimum of two hours daily access to the law library, and an opportunity to inspect the site of the alleged escape

attempt. According to the government, Trapnell had spent forty-one hours in the law library in the four week period between the arraignment and the court's November 10 order.

■ Trapnell does not now claim that the prison officials failed to comply substantially with the November 10 order. Trapnell's motions to hold the prison officials in contempt for alleged noncompliance with the November 10 order were denied, as were several motions for continuance by Trapnell for the purpose of more fully preparing his defense. In addition, the trial court allowed Trapnell two hours conference each night after trial at the prison with his standby attorneys. We do not find that the amount of time allowed to Trapnell before and during the trial, or the facilities available to him, to prepare his defense were so inadequate as to deny him due process of law.

## DISCLOSURE

■ McNally asserts that the court erred in denying his motion for mistrial on the grounds that the prosecution had failed to comply with the provisions of 18 U.S.C. § 3432.[14] That section mandates certain disclosures by the government before the trial of capital offenses. Prior to trial the government treated the aircraft piracy charge as capital because the death of Barbara Oswald resulted from the commission of the offense. *See* 49 U.S.C. § 1472(i)(1)(B). The government provided a list of the witnesses [15] to be called at trial as required by the statute, but did not provide the required list of veniremen. However, the government announced in court on December 12, 1978, on the first day of the trial in this matter, that it was no longer seeking the death penalty. Consequently, the government was not required to comply

14. The statute provides:

A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment,

stating the place of abode of each venireman and witness.

15. The list of witnesses did not include the name Michael Marchetto. The government claimed not to have known when it produced the list of witnesses whether it would use Marchetto as a witness.

with the provisions of the statute. *United States v. Savage*, 430 F.Supp. 1024, 1036 (M.D.Pa.), aff'd 566 F.2d 1170 (3d Cir. 1977), cert. denied 434 U.S. 1078, 98 S.Ct. 1273, 55 L.Ed.2d 786 (1978).

## DURESS DEFENSE

Trapnell claims that the district court committed error in ruling that Trapnell's offer of proof was insufficient as a matter of law regarding a duress defense to the conspiracy to escape and attempted escape charges.

The governing case regarding the duress defense to an escape charge is *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Like the instant case, the trial court in *Bailey* had refused to allow the defendants to present evidence related to the duress defense. The Court of Appeals reversed, 585 F.2d 1087 (D.C.Cir. 1978), and the Supreme Court reversed the judgment of the Court of Appeals. The Supreme Court held that in order for a defendant in an escape case to be able to present a duress defense to the jury, the defendant must show "an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law." 444 U.S. at 409, 100 S.Ct. at 634. Further, "if there was a reasonable, legal alternative to violating the law, . . . the defenses will fail." *Id.* at 410, 100 S.Ct. at 634. A third requirement is that the escapee must show "a bona fide effort to surrender or return to custody as soon as the claimed duress or necessity had lost its coercive force." *Id.* at 413, 100 S.Ct. at 636.

 The district court, ruling before the Supreme Court decided *Bailey*, relied on *United States v. Boomer*, 571 F.2d 543 (10th Cir.), cert. denied sub nom. Heft v. United States, 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 411 (1978), which required the same elements for a defense as enunciated in *Bailey* with a further requirement that "[t]here must be no evidence of force or violence used towards prison personnel or other 'innocent' persons in the escape attempt." *Id.* at 545. In considering the *Boomer* criteria, the trial court found some proof of a threat to Trapnell's life, but questioned whether the threat was imminent, as the proof showed no continuing threat to Trapnell in the two months before the escape attempt. As the trial court found no evidence of Trapnell's having complained of the threat to the prison authorities, it concluded that Trapnell had reasonable untried alternatives to escape in order to avoid the threat to his life. Regarding the use of force or violence towards prison personnel or innocent persons, the court noted that unindicted co-conspirator Oswald died in the course of the escape attempt and that the pilot of the helicopter had been kidnapped at gunpoint. The *Bailey* requirement that an escapee claiming duress as a defense demonstrate an effort to return to lawful custody is applicable in a case such as this when the escape attempt was unsuccessful, but it must in such a case be modified to require a showing that the prisoner intended to turn himself or herself in to custody if the escape had succeeded. *United States v. Caldwell*, 625 F.2d 144 (7th Cir. 1980).

 We find no error in the trial court's determination that the duress defense was not adequately supported as a matter of law by the offer of proof tendered by Trapnell. We have reviewed the offered evidence and agree with the district court that the evidence would not demonstrate the requirements for the duress defense and that therefore the defense should not have been submitted to the jury. The testimony showed that Trapnell attempted to have guns, clothing, money, and transportation available to him upon his escape. Inmate Marchetto testified that Trapnell told him that after escaping he would go to New Orleans and commit robberies there. None of these actions would indicate an intent to return to custody after the escape. Nor did the evidence show any attempt by Trapnell to seek institutional protection from the threats to his life. Trapnell's argument that the prison officials would have failed to protect him was not supported by an offer of proof. The fact that Trapnell had

failed to prove that the threats against him had continued in the two months before the escape attempt may provide an alternative justification for the trial judge's refusal to allow the duress defense and the relevant evidence to go to the jury. Under these facts, we do not need to rule whether the additional requirement of *Boomer*, regarding the lack of injury to innocent persons during the escape attempt, continues to be a valid requirement subsequent to the decision in *Bailey*.

Finally, Trapnell argues that the trial court in *Boomer* did allow the defense to be presented to the jury, while in this case the defense was ruled improper as a matter of law. It is clearly proper for a trial court to rule against a proposed defense as a matter of law. In *United States v. Michelson*, 559 F.2d 567 (9th Cir. 1977), the court found no error in the trial court's refusal to submit a duress defense when the escapee remained at large for almost two years after escaping from prison. In *Boomer*, the Court of Appeals noted that the evidence very strongly cast doubt on the intent of the prisoners to turn themselves in had the escape been successful, but that "the trial court, no doubt out of an abundance of caution, submitted the matter of coercion to the jury under instructions which we find adequate." 571 F.2d at 546.

## SPECIFIC CRIMINAL INTENT

Trapnell argues that the trial court committed plain error in failing to charge the jury that aiding and abetting requires specific criminal intent. This disputed instruction relates to Counts 4 and 5, those charging air piracy and kidnapping. In light of our reversal of Trapnell's convictions on those charges on other grounds, we have no need to discuss the adequacy of the court's instructions.

## CONCLUSION

The judgments of the trial court are affirmed as to the convictions of defendants McNally and Trapnell for conspiracy to escape and attempted escape (Counts 1 and 2); the judgments of convictions of air pira-

cy and kidnapping are reversed as to defendants Trapnell and McNally. We remand this case to the district court with directions to enter a judgment of acquittal as to McNally on Counts 4 and 5 and remand to vacate Trapnell's conviction on Counts 4 and 5 for a new trial.